Argued December 15, 1954, affirmed September 21, 1955,
petition for rehearing denied November 16, 1955

# BARNES ET AL v. EASTERN AND WESTERN LUMBER COMPANY

287 P. 2d 929

556

*Wilber Henderson* argued the cause for appellants Eastern and Western Lumber Company, et al. With him on the briefs were Carl E. Davidson and Charles P. Duffy, all of Portland.

*Robert L. Sabin* argued the cause for appellant United States National Bank of Portland, as Executor and Trustee under the Will of Frank H. Ransom, Deceased. With him on the briefs were Sabin & Malarkey and Carmie R. Dafoe, Jr., all of Portland.

*Robert F. Maguire* argued the cause for respondents. With him on the brief were Maguire, Shields, Morrison & Bailey, Latourette & Latourette, Henry A. Buehner and Harrison E. Spangler, all of Portland.

ROSSMAN, J.

Four members of this court, prompted by a belief that a judge should not only be fair but should also be free from all relationship to the case and its parties

that might afford ground for distrusting his impartiality, announced after this appeal was filed that they deemed themselves disqualified and would not participate in the disposition of the appeal. The circumstances which induced their action were well-known to all of the parties. After those four justices had made their announcement, all parties joined in a petition requesting all seven justices to hear the case. The petition evinced confidence in the impartiality of all members of this court. Thereupon the case was heard in banc. We make this explanation so that no one will infer that any member of this court, without express approval, participated in the disposition of an appeal in which any party might have cause to deem him disqualified.

This is an appeal by 18 of the 29 defendants from a decree in favor of the plaintiffs, 12 in number. The subject matter of the suit was 2500 shares of the capital stock of Eastern and Western Lumber Company, a corporation, which was dissolved November 6, 1946, before this suit was instituted, but which, nevertheless, was named as one of the 29 defendants. The plaintiffs were the owners of the aforementioned 2500 shares on February 8, 1944, and on that day sold them to Charles B. Duffy, K. H. Koehler, Frank H. Ransom and L. A. Morrison. Those four persons were the principal executive officers of the Eastern and Western Lumber Company. The plaintiffs were unaware of the fact that those individuals were the buyers, and allege that they would not have sold their stock had they known that the principal officers of the corporation were the buyers. Morrison died April 25, 1945, and Ransom on June 10, 1946. December 3, 1948, this suit was instituted. Its purpose, among others, was to effect a recission of the sale of the stock. One Lee

Burton Morrison, executor of the estate of L. A. Morrison, deceased, and the United States National Bank of Portland, trustee under Morrison's will, were made party defendants and both are now appellants. The same banking institution, as executor and trustee under the will of Frank H. Ransom, deceased, is again a defendant-appellant in the capacities last mentioned. Charles B. Duffy and K. H. Koehler were other defendants.

We take the following from the challenged decree:

"Ordered, Adjudged and Decreed as Follows:

"1. That the sale and transfer by plaintiffs on February 8, 1944, of their 2500 shares of capital stock of Eastern and Western Lumber Company to Charles B. Duffy, K. H. Koehler, Frank H. Ransom, and L. A. Morrison, be and is rescinded, cancelled, annulled and held for naught as of February 8, 1944;

"2. That Eastern and Western Lumber Company having been dissolved and liquidated and its assets distributed to its stockholders appearing of record and it being impossible for the defendants Charles B. Duffy, K. H. Koehler, The United States National Bank as executor of the Estate of Frank H. Ransom, deceased, and Lee Burton Morrison as executor of the estate of L. A. Morrison, deceased, to return to plaintiffs their said 2500 shares of capital stock of Eastern and Western Lumber Company the plaintiffs are entitled to and are hereby given joint and several judgment against Charles B. Duffy, K. H. Koehler, The United States National Bank of Portland as executor of the estate of Frank H. Ransom, deceased, and Lee Burton Morrison as executor of the estate of L. A. Morrison, deceased; and in the following amounts,—

"(a) $782,495.00, together with interest thereon at the rate of 6% per annum from October 23, 1946, which said interest up to the date of the entry of this decree is $263,178.95."

At that point the decree added 14 supplementary awards. Seven of the latter were each in the amount of $3,750 and represented dividends upon the aforementioned 2500 shares of corporate stock which were paid to the four defendants, Duffy, Ransom, Koehler and Morrison, subsequent to February 8, 1944. The remaining part of the 14 supplementary awards consisted of interest upon the seven sums of $3,750, calculated from the time payment was made to the day of the decree's entry.

Apart from Duffy, Koehler, and the representatives of the estates of Ransom and Morrison, all of the other defendants are beneficiaries under the wills of the two decedents last mentioned or under the will of one W. B. Ayer, whom we will later identify. Since Duffy, Ransom, Koehler and Morrison were, according to the decree, the purchasers of the aforementioned block of stock and are the individuals whom the plaintiffs allege employed deceit, we will hereafter, for purposes of convenience, refer to them as the defendants and appellants, even though Ransom and Morrison died before this suit was instituted. After this appeal was argued, the plaintiffs-respondents, in consideration of $280,000 paid to them, stipulated "not to further prosecute said suit or press their said claim against" the defendant-appellant United States National Bank, as executor and trustee of Ransom's estate, nor against any of the other "Ransom defendants" (beneficiaries of Ransom's estate). The motion of the plaintiffs-respondents which presented the stipulation to this court reserved to the plaintiffs the right to continue the suit against all of the other defendants-appellants, subject to a credit of $280,000. Based upon the motion and stipulation, this court entered an order which gave effect to the stipulation. Hence, we are not called upon to adjudicate the

liability or nonliability of Ransom's estate or of any of the "Ransom defendants." We will, however, be required frequently to mention Ransom, and when we use the word "defendants" we will include him in the term.

The challenged decree was entered after a trial, in the course of which evidence was received which, as transcribed, covers approximately 4,000 pages. The testimony is supplemented by exhibits, more than 300 in number, which consist in large part of correspondence, bank records, bookkeeping entries and corporate minutes. The entire record has been examined with care. Our review of it will be lengthy, but the facts in this case are of primary importance.

The trial judge made no findings of fact. His decree, however, contains this recital:

> "The court having heretofore found for the plaintiffs and against the defendants that the allegations of plaintiffs' second amended complaint as amended, and the allegations of their reply to the answers and the further and separate answers and defenses of the defendants  *  *  *  are true  *  *  * and that the allegations set forth in the answers and further and separate answers and defenses of defendants last above named are not sustained by the evidence and are not true  *  *  *."

It will be observed that the decree states that the allegations of the second amended complaint and those of the reply "are true" and that those of the answer were not sustained by the evidence. The four defendants, according to charges made by the plaintiffs' pleadings, deceived the plaintiffs and in that manner induced them to sell their stock. The complaint gives the following specifications of the general charge of fraud: the defendants (1) concealed from the plaintiffs

some of the lumber company's assets; (2) misstated and depreciated to the plaintiffs the value of a parcel of land in Portland upon which the lumber company's plant stood; (3) misrepresented and belittled to the plaintiffs the value of a large tract of pine timberland in Klickitat county, Washington, which the company purchased in 1920 as an investment; (4) falsified to the plaintiffs the probable value, upon liquidation, of the corporation's assets; (5) for the wrongful purpose of inducing them to anticipate corporate losses, told the plaintiffs that they, as the managing officers of the company, intended to cut the Klickitat county timber, bring the logs to Portland and mill them in the corporation's Portland plant; and (6) wrongfully concealed from the plaintiffs the fact that the defendants were the purchasers and induced them to infer that the purchaser was an individual who lived in St. Paul, Minnesota.

The answer of the defendants traversed all of the charges of fraud. It denied that the defendants purchased the 2500 shares from the plaintiffs and averred that the latter, with full knowledge of the facts, sold their stock to an investment firm entitled Hess and Butchart. It alleged that the defendants later purchased the stock from that firm. The answer tendered defenses of estoppel, laches and the bar of the statute of limitations.

The lumber company, which was incorporated in August, 1902, constructed a sawmill in Portland upon a site, about 22 acres in extent, which lay on the west bank of the Willamette river. Prior to 1930 the company earned large dividends for its stockholders. In the years 1930 to 1936, both inclusive, and in 1938 it operated at a loss. The year 1937 was profitable; so, also, was 1939 and from then on to 1946, when it was

dissolved. The dividends in recent years were smaller than those which it earned prior to 1930. The evidence suggests that the reduction in the amount of profits was due to war controls, the high cost of labor and the fact that, since the company had cut virtually all of its timber, it was compelled to resort in part to the log market for its supply, where it faced the higher sums which the plywood producers bid for logs.

One of the incorporators of the company was the aforementioned W. B. Ayer, who, from 1902 to 1930, was president of the company and the dominating influence in its affairs. He died in 1935. Frank H. Ransom, Charles B. Duffy and K. H. Koehler joined the company's staff as employees about the time the company was organized or shortly thereafter. Upon the death of Mr. Ayer, Mr. Ransom succeeded him as president. After the other three defendants had joined the company's staff they, too, advanced to higher positions. Eventually Mr. Morrison became vice-president, Mr. Duffy, secretary-treasurer, and Mr. Koehler, vice-president and manager. All four were also members of the corporation's board of directors which consisted of seven members. The four men held the offices named when the plaintiffs sold their 2500 shares of stock.

The items of property owned by the lumber company which are material to this suit are the following: (1) the millsite in Portland, about 22 acres in extent; (2) the Klickitat county timberland; and (3) miscellaneous items aggregating in value $100,471, termed by the plaintiffs "concealed" assets. The Klickitat county timberland was not one of the tracts of timber which for many years had supplied the mill with its logs. Items (1) and (2) were the most valuable that the corporation possessed.

According to the complaint, the defendants fraudulently told the plaintiffs that the millsite was worth no more than $273,000 when, in truth, according to the plaintiffs, its value was $785,000. Likewise, the defendants told the plaintiffs, so the complaint charges, that the Klickitat timber was worth no more than $790,000 when they knew, so the pleading says, that its value was more than $2,000,000. The miscellaneous items which the plaintiffs term "concealed" assets were four in number. We infer that the plaintiffs termed them concealed largely because they did not appear in the current account books of the company. One of the "concealed" assets was identified in the company's records as Butte Creek Timber and Lands; it yielded upon liquidation $28,503.58; a second, identified as Eufaula Lands, produced $21,813.25; a third, known as Wahkiakum Land, brought $385.40; a fourth, termed Molalla Inventory, consisted of logging equipment; its sale brought $49,770.82. The evidence indicates that in 1942 or 1943 Ransom told Mrs. Buehner that liquidation should yield for the shareholders about $218 per share. Liquidation was not undertaken at that time, but when it was effected, about three years later, it produced more than $400 per share.

The identity of only one of the plaintiffs, Myrtle Buehner Spangler, is material in the disposition of this cause. All of the representations which the complaint deems fraudulent were make to her; she was the representative of the others. Mrs. Spangler is the daughter of the late Albert Brix, who in his active years was engaged in business as the Brix Logging Company and as the Knappton Lumber Company. In 1915, when she was in her teens, she was married to Henry Buehner, whose father, Philip Buehner, together

with W. B. Ayer, organized the Eastern and Western Lumber Company. Mr. Philip Buehner became the owner of one fourth of the company's capital stock, 2500 shares. He was elected a director of the company and still served in that capacity at the time of his death. Upon their marriage Mr. and Mrs. Henry Buehner took up their residence in Coos Bay where they became the parents of three children. In the city just mentioned Henry Buehner operated the Buehner Lumber Company. In 1923 the plant was sold and thereupon the family returned to Portland. Following the sale of the Buehner Lumber Company, the Buehner Investment Company, which is one of the plaintiffs in this suit, was organized. It was engaged in the business of investing and managing the capital funds of the Buehner family. Philip Buehner was its president and Henry Buehner its vice-president. Henry Buehner died May 1, 1937, and Philip Buehner in 1940. After the death of Henry Buehner, his widow became vice-president of the Buehner Investment Company and active in its management. Upon the death of her father-in-law, she (plaintiff Myrtle Buehner Spangler) was made president. At about the same time she succeeded him upon the board of directors of the Eastern and Western Lumber Company. Evidently the transactions of the Buehner Investment Company were sizeable. It maintained an office in a downtown office building in Portland, had a full-time secretary and subscribed to financial publications such as the Wall Street Journal. Some of its assets consisted of investments in lumber and logging enterprises. Its letterhead carried these words under the corporate name: ''Timber—Properties—Investments''. Letters written by Mrs. Spangler are a part of the record. They evince a good grasp of business terms and the ability to analyze as well as

give lucid explanation of entries in such financial papers as trial balances.

Several years after the death of Henry Buehner in January, 1945, his widow, the plaintiff of whom we spoke in the preceding paragraph, married Harrison Spangler, a member of the Iowa bar. Mr. Spangler appeared in the trial court as one of the plaintiffs' attorneys and is one of their counsel upon appeal.

As we have indicated, the subject matter of this suit is 2500 shares of stock of the lumber company. Mrs. Spangler was not the owner of all of those shares. The Buehner Investment Company and six individuals who are members of the Buehner family share with her in the ownership of the block. The 2500 shares were represented by 14 certificates held by eight owners. All of the owners, with the exception, of course, of Mrs. Spangler, annually gave their proxies to her and in the sale of the stock were represented by her as agent. From January, 1941, when she was elected to the board of directors of Eastern and Western Lumber Company, to February 8, 1944, when she sold the 2500 shares, she continued to serve as a member of that board and attended all of its meetings. She also attended all of the meetings of the stockholders which were held at the times relevant to the issues before us. The block of 2500 shares became known as the Buehner stock. In referring to it, we will employ that designation.

We have mentioned an investment firm entitled Hess and Butchart. The plaintiffs claim that the firm was the defendants' agent when they purchased the Buehner stock. The defendants contend that the plaintiffs sold their stock outright to the firm and that they (defendants) later bought it from the firm. A member of the firm by the name of H. L. Phillips was

the individual who negotiated with Mrs. Spangler and who consummated the transaction. The evidence indicates that as early as January 30, 1942, Mrs. Spangler gave consideration to suggestions which contemplated a sale of the Buehner stock, and that upon occasion a representative of Hess and Butchart spoke to her. The plaintiffs lived in various places and, through correspondence, had discussed the value of their stock. The conception of value of most of them, with the possible exception of Mrs. Spangler, centered upon $100 per share as the amount which the stock was worth. Mrs. Spangler testified that she was undecided about the stock's value. In December, 1943, Mr. Duffy received information from a friend that Mrs. Spangler had indicated to Mr. Butchart an intention to sell the Buehner stock. The defendants, Duffy, Ransom, Koehler and Morrison, had been of the opinion for sometime that they should acquire the Buehner stock if it was available at an attractive price. Ransom, Koehler and Morrison authorized Duffy to negotiate for the stock at a price of not more than $100 per share. After receiving information that Mrs. Spangler might sell the stock, Duffy told Butchart that he would buy it, and on February 1, 1944, handed Butchart a letter which stated:

"This letter will act as a firm commitment on my part for you to purchase for my account 2500 shares of Eastern and Western Lumber Company stock, par value price at $100 per share."

The aforementioned H. L. Phillips, a member of Hess and Butchart, presumably told Mrs. Spangler that he had a buyer who would purchase the Buehner stock for $250,000. He falsely stated that the buyer lived in St. Paul, Minnesota. February 1, 1944, Phillips

handed to Mrs. Spangler a paper which appeared to be a telegram and which read:

"Received from St. Paul, Minnesota, February 1, 1944

H. L. Phillips,
702 American Bank Bldg.
Portland

We can confirm for immediate acceptance purchase from you of twenty-five hundred shares Eastern and Western Lumber Company stock at one hundred dollars per share. Please call confirmation nine thirty my time tonight.

Rex."

Phillips, as a witness, conceded that the telegram was spurious, that he wrote it in his own office and that "Rex" was a fabrication.

When the bogus telegram was shown to Mrs. Spangler she was unaware of its illegitimacy and assumed that it was genuine. She promptly communicated with her co-owners of the stock and the sale was consummated February 8, 1944. It is agreed that the four defendants, and not the nonexistent Rex, were the individuals whom Phillips had in mind as buyers and that after the 14 certificates which Mrs. Spangler delivered to the escrow agent had been canceled, new certificates to the four defendants were issued in these denominations: Duffy, 949 shares; Koehler, 739 shares; Morrison, 737 shares; and Ransom, 75 shares. Mrs. Spangler swore that she would not have sold the stock had she known that officers of the company, intimately familiar with its affairs and prospects, were the buyers.

July 12, 1945, the Eastern and Western Lumber Company and the Commission of Public Docks of the city of Portland effected an agreement whereby a part

of the site occupied by the lumber company's mill was sold to the dock commission. February 11, 1946, the remaining part of the site was sold to the same public body. The first parcel brought $345,790 and the second, $440,000. The total was $785,790. April 9, 1945, the lumber company and the Longview Fibre Company executed an option agreement whereby the latter company was granted the right to purchase the Klickitat county timberland for the sum of $2,000,000. The option was later exercised. Through liquidation of the assets, the four defendants realized a liquidating dividend of more than $400 per share.

The foregoing will serve as a prelude to and facilitate an understanding of the contentions which the parties make. After we have stated the assignment of error and have mentioned the appellants' contentions, we will return to the evidence.

The defendants-appellants present a single assignment of error which submits that the trial judge erred in holding for naught the sale of the 2500 shares of corporate stock. It also submits that he erred in awarding a money judgment in favor of the plaintiffs and against the defendants, Duffy, Koehler and the aforementioned representatives of the estates of Morrison and Ransom "jointly and severally in the amount of $782,495, together with interest thereon from October 23, 1946 * * * and for seven several amounts of $3,750.00 each with interest thereon * * * and requiring the several appellants to respond as to the money judgments * * *."

We will now consider the contention that the plaintiffs failed to prove their charges of fraud.

In our analysis of the charges of fraud, we deem it our duty to bear in mind the fact that Mrs. Spangler was a member of the company's board of directors

during the period in which the defendants [if the plaintiffs' charges are warranted] defrauded the plaintiffs. She was elected to the board in January, 1941, and remained a member until the hour when she disposed of her stock. She attended eight meetings of the board. Therefore, the relationship of the purported tortfeasors to the alleged victim was not that of directors to stockholder, but that of directors to director. The plaintiffs contend that the defendants desired to acquire the Buehner stock at a small fraction of its value and that, in order to consummate their evil purposes, resorted to the fraudulent practices which the complaint specifies. If their charges are true, four directors deceived and defrauded a fellow member of the board. Although the four defendants did not own a majority of the corporation's stock, they and other owners who were in accord with their views constituted a majority of the shareowners. Mrs. Spangler and another director by the name of M. B. Henderson, whose opinions concerning the company and its future were similar to hers, were generally in the minority at board meetings.

In their briefs the plaintiffs contend that a fiduciary relation exists between (a) a director and a shareholder, and (b) a director and a fellow director in sales of stock and in other transactions that occur between them. They cite in support of their contention the following Oregon decisions and in addition some chosen from other jurisdictions: *Davis v. Hofer,* 38 Or 150, 63 P 56; *Wills v. Nehalem Coal Co.,* 52 Or 70, 96 P 528; *Muellhaupt v. Strowbridge Estate Co.,* 136 Or 106, 298 P 189; and *Enyart v. Merrick,* 148 Or 321, 34 P2d 679. We have studied each of those opinions with care, but do not believe that they support the contentions of the plaintiffs. Our view of the

evidence renders unnecessary a determination of the contention submitted by the plaintiffs that a director is a fiduciary of a fellow director when one of them purchases from the other shares of stock issued by their corporation. Hence, we deem it unnecessary to set forth herein an analysis of the above cited decisions.

During the times which are material in this suit § 77-218, OCLA (repealed by Oregon Laws 1953, ch 549, § 136), provided as follows:

" * * * From the first meeting of the directors, the powers vested in the corporation are exercised by them, or by their officers or agents under their direction, except as otherwise specifically provided in this chapter."

The by-laws of the corporation contained this provision:

"The general management of the business of the company shall be in the hands of the Board of Directors who shall possess, enjoy and exercise all powers whatsoever in full for the transaction of business and in the management of the affairs of the concerns of the corporation."

In *Corbett v. Woodward*, 5 Sawy 403, 6 Fed Cas 3223, Judge Deady, a pioneer member of the Oregon judiciary, declared:

" * * * By becoming a director, which includes the taking of an oath to 'faithfully and honestly discharge' the duties of the office, he engages to take good care of the interests of the stockholders and creditors intrusted to his charge, and this necessarily implies that he will use due diligence to keep himself properly informed concerning the same."

In *Gantenbein v. Bowles,* 103 Or 277, 203 P 614, this court said:

" * * * The directors are presumed to know, * * * the financial condition of the Company."

Section 77-236, OCLA, which was in effect during the times material in this suit, but which was repealed by Oregon Laws 1953, ch 549, § 138, in prescribing the manner in which a corporation shall maintain its records, said that the "books of the corporation necessary for carrying on its business shall be subject to the inspection, at all reasonable hours, by any person interested therein and applying therefor."

■ Accordingly, it was the duty of Mrs. Spangler, as a director, to keep herself informed concerning the assets and activities of the Eastern and Western Lumber Company. Sections 77-218 and 77-236, OCLA, empowered her to gain information which she needed for the competent discharge of her duties. Her election to the board of directors did not constitute merely the bestowal of an honor upon her; her election and acceptance of the office imposed upon her important duties and responsibilities. The duties and responsibilities which she assumed when she became a director were not less than those of the other members of the board.

■ We have seen that before becoming a member of the board of directors she served as vice-president of the Buehner Investment Company and that while so doing she must have become acquainted with balance sheets and the manner in which investors determine the value of securities. While serving as a member of the board of directors of the lumber company she took an active interest in its transactions. In 1942 she sought to persuade the board to adopt a program of liquidation. Prior to that she attempted to enlist enough stockholders to enable her to command a majority. Due to the circumstances of which we have taken note, we believe that, although Mrs. Spangler was a mother and a housewife, we must deem that in the period which

is material to this case she possessed sufficient knowledge of business and bookkeeping practices to enable her to grasp the significance of the various papers and records which came to her attention when she contemplated and consummated the sale of the Buehner stock. In addition, she possessed a practical acquaintanceship with investment practices and the problems that confront the lumberman. The knowledge which she had acquired must be imputed to her co-owners of the Buehner stock.

We turn directly to the defendants' contentions that the plaintiffs did not prove that the defendants were guilty of misrepresentation in the purchase of the Buehner stock.

██ A preceding paragraph sets forth the specifications of the plaintiffs' general charge of fraud. We read with painstaking care the lengthy transcript of testimony and bestowed similar attention upon the numerous exhibits. Manifestly, the plaintiffs had the burden of proof upon all of their charges. Our analysis of the record has not satisfied a majority of this court that the first five specifications of the charge of fraud were sustained. The majority believe that in regard to those specifications the plaintiffs did not meet the exacting demands which the law imposes upon those who charge others with deception. This opinion would be prolonged if we included in it our analysis of the evidence which the parties presented upon those five phases of the charge of fraud. We shall refrain from so doing and will confine ourselves to the statement that, in the opinion of the majority, the first five specifications are without merit.

The sixth specification of the general charge of fraud submits that the defendants knew that the plaintiffs would not sell the Buehner stock to insiders, such

as the defendants, and therefore deceived them into a belief that the purchaser was someone who lived in St. Paul, Minnesota. It will be recalled that, seven days before the challenged transaction was effected, H. L. Phillips, a stockbroker whom we have mentioned, showed Mrs. Spangler a paper which appeared to be a telegram addressed to himself from a person in St. Paul offering $100 per share for the 2500 shares of Buehner stock. The defendants freely concede that the paper was not a telegram and that Phillips wrote it in his office in Portland. They make no effort to excuse his iniquitous act. Phillips, as we shall later show, made other false representations to Mrs. Spangler concerning the identity of the buyer.

Before considering the merits of this phase of the charge of fraud it is necessary to determine whether Phillips was, as the plaintiffs claim, the agent of the defendants.

■■ Generally, an agent is one who has authority to act for another in contractual dealings with third persons: Mechem on Agency, § 26. It is clear from the evidence that Phillips did not represent Mrs. Spangler, for she dealt with him at arm's length throughout the negotiations and was represented by her own attorney when the sale was closed. The record admits of only two possibilities as to the relationship between the defendants and Phillips: (a) that of buyers and seller, or (b) that of principals and agent. In a three-party transaction involving only a single purchase, the cases, as we will illustrate, indicate that whether the relation between customer and broker is one or the other of the two just mentioned, turns on whether the customer and the broker bargain at arm's length with each other concerning price and the other terms which the customer receives when he completes his purchase, or

whether the understanding between them is that the broker shall act for the customer in the transaction.

In *Atlas Land Co. v. Hendricks,* 298 F 589, the parties-defendant were a land company and a real estate agent. In two contemporaneous transactions the land company had granted a tract of land to the real estate agent and he in turn had conveyed to the plaintiff. Upon averments that the real estate agent was the representative of the land company and had made false representations concerning the land, the plaintiff brought suit to rescind the land contract and a mortgage which was connected with his purchase. He also sought the recovery of part of the purchase price which the real estate agent had paid to the land company. The court's discussion of the facts indicates that the land company and the real estate agent dealt at arm's length with each other. The real estate agent had entered into negotiations with the land company concerning the purchase of the land sold to the plaintiff before he met the latter. After the agent had agreed to sell the property to the plaintiff at a profit of $3,600 for himself, he then closed his previous negotiation with the land company so that the terms of his obligations to it would correspond with those of the plaintiff's obligations to him. The court held that the real estate agent was not the agent of the land company and the judgment in favor of the plaintiff against it was reversed.

In *Foley v. Nimocks,* 175 Ia 464, 157 NW 178, the plaintiff had purchased four shares of stock in a corporation. Two of them were purchased at the request of the defendant, who agreed to take them from the plaintiff at a prescribed time. The defendant failed to perform and the plaintiff was required to pay an assessment on the two shares as a result of the corpo-

ration's bankruptcy. An action was brought to recover the price paid for the two shares and the amount of the assessment. The defendant contended that the relation between himself and the plaintiff was that of buyer and seller and that his performance was excused because the plaintiff failed to tender the stock. However, it was held that the relation between the parties was that of principal and agent. The court found that the parties had effected an understanding whereby the plaintiff was to handle the stock as agent until the defendant took it. The court's treatment of the facts reveals that the parties did not deal at arm's length, but rather that the plaintiff, who, prior to being approached by the defendant, had no interest in acquiring the stock, merely accommodated the defendant who lacked money for the purchase.

■ We shall now consider the evidence which discloses the relation that existed between the defendants and Phillips in order to determine whether they bargained at arm's length as to price and other terms or whether the defendants controlled the transaction and Phillips merely carried out their instructions. Defendant Duffy testified that his first contact with Butchart and Phillips of the firm of Hess and Butchart concerning the Buehner stock occurred in the latter part of 1943 or the beginning of 1944, although there is evidence that Duffy called upon the brokerage firm earlier. The following is Duffy's version of the circumstances which led to his first meeting with Butchart and Phillips:

"Q And were you not asked the following question:

'Q 1943?'

And did you not make the following answer:

'A '43. And when I conferred with my associates I then made an effort to buy the stock. Mr.

Dick told me that we were in a precarious position, that if Mrs. Buehner sold this stock, and then when the Art Association got their stock from the trust account he was satisfied that that stock would be immediately sold as it wasn't the class of stock that the Art Association would carry, so he said, "You boys should get together and buy that stock of Mrs. Buehner," he says, "even if you have to pay as high as par for it," which I thought was too much, but Mr. Dick told me that if we could buy the stock he would see that it was financed for me, and I told my associates about it. Mr. Dick had told me that Mr. Butchart was the party that was offering it, and I went to see Mr. Butchart and from that time on he handled the situation.'

Did you not so testify?

"A I think I did."

Duffy testified as follows concerning the first time he spoke to Butchart about the purchase of the Buehner stock and the understanding which he then effected:

"Q Well, just when was it that you first went and talked to Mr. Butchart or to any person in his organization with regard to having him try to acquire this stock for you?

"A It was late in 1943 or possibly early January of 1944.

&ast; &ast; &ast;

"Q Did you tell Mr. Butchart or anyone in his organization what you were willing to pay for the stock when you first went to see him?

"A Yes, sir, I did.

"Q What did you tell him?

"A * * * I told him I thought he ought to acquire the stock for around $70 or $75, and he said he didn't think he could get it for that.

&ast; &ast; &ast;

"Q All right. And when he said he didn't think he could get it for that price, $70 or $75, you told

him to go out and find out what he could buy it for, didn't you?

"A  He told me it had been offered at par, and I told him to try to buy it at $70 or $75.

"Q  Didn't he tell you he felt sure he couldn't get it for $70 or $75, and didn't you then tell him to go out and see what was the best price he could get it for?

"A  I told him to make inquiry about it, yes.

"Q  And did you tell him that you would pay up to par if you had to?

"A  I did then, or at some later time.

"Q  But the idea was to have him go out and get it at the best price below par if possible, is that it?

"A  That's right."

Later, Duffy, in a letter dated February 1, 1944, addressed to Hess and Butchart, probably to confirm a previous understanding with them, authorized the firm to purchase for him the Buehner stock at a price of $100 per share.  The letter reads:

"This letter will act as a firm commitment on my part for you to purchase for my account 2500 shares of Eastern and Western Lumber Company stock, par value at $100.00 per share.

"Payment for the above securities will be made immediately upon notification from you that the transaction has been consummated."

Butchart testified that the purchase of the Buehner stock was consummated after he received the above letter:

"Q  I think we are talking at cross purposes there, Mr. Butchart.  I did not make myself clear. You did not make a firm offer to Mrs. Buehner of the Buehner Investment Company until you had a firm offer from somebody else to buy the stock, did you?  *  *  *  And wasn't Mr. Duffy's offer the firm offer you had?

"A  Well, it would seem so."

The purchase of the Buehner stock was completed February 8, 1944. The foregoing testimony, in our opinion, establishes that Butchart and Phillips were the agents of Duffy. The parties did not deal at arm's length with each other. Rather, Duffy instructed Butchart to try to get the stock at about $70 to $75 per share, or at the most favorable price below par if it was possible to acquire the stock below par. Subsequently Duffy gave Hess and Butchart written authority to buy the stock. Therefore, Phillips, who was associated with Hess and Butchart and who negotiated the purchase of the Buehner stock, was acting for Duffy and his principals. He was their agent.

Since we have concluded that Phillips and his firm of Hess and Butchart were the agents of the defendants, we now return to the specification of the general charge of fraud which centers in the spurious telegram which Phillips handed to Mrs. Spangler a few days before the plaintiffs sold their stock. This phase of the charge of fraud is based upon a contention that the defendants knew that Mrs. Spangler would not sell the stock to them and that Phillips, in order to circumvent her objection, resorted to the phony telegram.

The defendants, in challenging this specification of the charge of fraud, cite decisions which declare that, generally, the buyer owes no duty to inform the seller of the identity of the person on whose behalf the purchase is being made. Good illustrations of the type of transactions to which the rule enunciated in those decisions is applicable are afforded by sales of goods over the counter for cash; in most instances of that kind the identity of the contracting parties is immaterial. 3 Corbin on Contracts, § 603. Cases of that general type are inapposite to the situation before us. If there

is no duty to divulge the identity of the buyer, or if there is no misrepresentation concerning his identity, the question of materiality is not presented. *Haverland v. Lane,* 89 Wash 557, 154 P 1118, cited by the defendants, was an action to recover damages, resulting, according to the plaintiffs, from the defendant's alleged fraud. The court found as a fact that the plaintiffs were not interested in the identity of the ultimate purchaser and, therefore, it was unnecessary for the court to have discussed whether or not concealment of his identity warranted recovery in an action for deceit. In that case, the defendant was an officer, and the plaintiffs were shareholders, of the corporation whose stock was the subject matter of the sale. The defendant did not disclose to the plaintiffs the fact that he was purchasing the stock in order to resell it at a higher price to a subsidiary of the Bell Telephone Company. The court, in reaching its decision, said:

"We shall spend no time in discussing the contention that the concealment of the fact that the stock was bought for the interest if not for the account of the Bell Company was a deceit warranting a recovery. One of the plaintiffs admits that it made no difference to him who the actual buyer was, and the others so testify that the only fair inference to be drawn from the testimony is that they too had no interest in the purchaser. Their only concern was to get a satisfactory price."

In *Cowan v. Fairbrother,* 118 NC 406, 24 SE 212, an action to enjoin the vendor of a newspaper business from violating a covenant not to compete, it was said that the concealment or failure to tell the vendor of the identity of the purchaser of the business was not fraudulent per se. However, it does not appear that any misrepresentation of identity was made.

*Llewelyn v. Queen City Dairy, Inc.*, 187 Md 49, 48 A2d 322, cited by the defendants- respondents, held that a corporation has no cause of action against directors who fraudulently acquire stock from its shareholders. The decision stated that, aside from the question as to whether the duties of a trustee to make full disclosure are imposed upon directors who purchase stock from shareholders, the shareholders involved in the case had within their possession knowledge of the affairs of the corporation and that the identity of the ultimate purchaser was immaterial. The court apparently concluded that when directors deal openly with stockholders in purchasing their stock for resale, they are under no duty to disclose the ultimate purchaser. Misrepresentation of identity was not involved, much less the materiality of the identity of the ultimate purchaser in situations where he is a director.

■ The principle under analysis is stated as follows by Restatement of the Law, Agency, § 304:

"A person with whom an agent contracts on account of an undisclosed principal may rescind the contract if he was induced to enter into it by a representation that the agent was not acting for a principal and if, as the agent or principal had notice, he would not have dealt with the principal."

In the Comment following § 304, it is stated:

"* * * It may be material, however, because the other party does not wish to deal with the principal. Under such conditions, if the agent, having notice of such facts, represents that he is acting solely on his own account, the other party may rescind. If the agent knows that the other party would not enter into transactions with the principal, his failure to disclose the existence of the principal may be such misleading conduct that a court of

> equity or a court of law acting with equity powers may grant rescission or other relief.''

The decisions which we will now mention illustrate the application of the rule which we quoted from the Restatement.

In *Stewart v. Joyce,* 201 Mass 301, 87 NE 613, the plaintiff, a shareholder in the Gillette Safety Razor Company, sold his shares to the treasurer of the company who, in turn, transferred them to the other defendants. All of the others except one were directors of the corporation. The plaintiff had informed the treasurer that he would sell his stock to him but not to the other defendants. He was induced to sell his shares to the treasurer for less than their value by the false representation that the treasurer was making the purchase in order to retain his position with the company, and also upon false financial statements prepared by the treasurer. The court said:

> ''It having been further found that at the time he was buying for the purpose of selling or transferring stock to them (the other defendants) this representation was not only false but was properly held to be material, and the defendant's first exception must be overruled.''

The plaintiff in that case was granted relief against the intermediate purchaser, the treasurer, but the suit was dismissed as to the other defendants since the plaintiff failed to establish either agency or conspiracy between them and the treasurer. The decision indicates that the treasurer, and not the other defendants, profited from the transaction.

In *White Tower Management Corporation v. Taglino,* 302 Mass 453, 19 NE2d 700, specific performance of an agreement to convey land was denied to the purchaser because his identity was falsely represented

by his agent in the negotiations which preceded the agreement. The seller in that case had informed the agent that he would not sell to any person who was engaged in business and, more specifically, to anyone who operated a restaurant. The buyer was engaged in the latter business, but his agent told the seller that the purchasers were two persons who desired to obtain the land for residential use.

*Thompson v. Barry*, 184 Mass 429, 68 NE 674, rescinded a deed because the purchaser was represented in the negotiations which led to its execution as a person who would use the property for residence purposes, whereas it really was a church corporation which intended to construct a church upon the land. The identity of the purchaser was deemed material because it was indicative of the use to be made of the granted land which in turn would probably affect adversely the value of adjacent land which the grantor retained.

We shall review the decisions no further. We think that they justify the rule promulgated by the Restatement which is quoted in a preceding paragraph. Mechem, Outlines of Agency, 4th ed, pages 111 through 113, and note 44 Harv L Rev 1271, are in accord with the rule given by the Restatement and cite additional authorities which support it.

Parties who enter into transactions have a lawful right to determine for themselves those with whom they care to deal: *Crowder v. Yovovich,* 84 Or 41, 164 P 576. Through another's fraud they should not be deprived of that right. We think that the foregoing cases establish the proposition that the identity of the other party to the transaction is material if the transaction would not have been consummated had the seller known who the buyer was and the latter either knew, or had good reason to know, of the seller's pre-

disposition toward him.  The facts in the cases that we reviewed differ slightly from those in the case at bar in that in those situations the seller informed the buyer through his agent that he would not sell to him, whereas, here, as we shall presently indicate, the defendants only had reason to know that the plaintiffs would not sell to them.  But this dissimilarity would not yield a different result, for, in the latter situation, the buyer does not improve his position by falsely representing his identity and thus make it appear unnecessary for the seller to disclose his aversion for him.  Since the buyer's conduct is more probably than not influential in preventing confirmation of his belief that the seller has antipathy toward him, it seems fair to regard the situation as though the buyer's unuttered belief was confirmed.  A decision which illustrates this view is *Gordon v. Street*, 2 QB 641.  There, the plaintiff, a moneylender, whose reputation for oppressive dealing was notorious, assumed a false name and thereby managed to lend money to the defendant at a large rate of interest.  The defendant swore that he would not have borrowed from the plaintiff had he known who he really was.  The report of the case does not indicate that the plaintiff had been informed of the defendant's attitude toward him, but shows that he knew that most people avoided him because of his reputation for oppressive dealing.  The court deemed the misrepresentation material and a defense to an action on the note.

No hardship is thrust upon a buyer, who has reason to know that the seller will not deal with him, to remain silent or, if he speaks, to state the truth concerning his identity.

We now turn to the facts of this case.  In a preceding paragraph we stated that Phillips, the stock-

broker, upon the eve of the challenged transaction handed to Mrs. Spangler a paper in the form of a telegram which appeared to have been sent to him from St. Paul, Minnesota, and which read:

"We confirm for immediate acceptance purchase from you of twenty five hundred shares Eastern and Western Lumber Company at one hundred dollars per share. Please call confirmation nine thirty my time tonight.                    Rex."

The defendants, as we have noticed, frankly concede that the "telegram" was a ruse. The record indicates that Phillips made other false representations that his client was from the East. Mrs. Spangler testified:

"Q Now you started to say that he came into your office in the Public Service Building on the 31st of January, 1944, and you started to tell us what he had told you.

"A Stating that he had a client for our Eastern—interested in wanting our Eastern and Western stock, the full 2500 shares.  *  *  *

"Q Five points for commission. Did he say what part of the country this client lived in or did business?

"A He had a letter, apparently not pertaining, but at the time gave me the idea, the impression that it was from a client in St. Paul, and intimated that it was a man dealing for Weyerhaeuser, the intimation. And this St. Paul firm was meeting— they were meeting in St. Paul the next night. Therefore, there was need of great haste in the decision, *  *  *."

Mrs. Spangler testified that she would not have sold the Buehner stock had she known that the purchasers were the defendants. Her testimony to that effect is credible, and we accept it as such. The purchasers, whose identity Phillips concealed, were the executive officers of the corporation. Each of the four was active

in the management of the business and intimately familiar with the corporation's affairs. Through their daily contact with its operations, the four undoubtedly came into a superior position to judge the prospects of the company, the value of its assets and the likelihood that the Buehner stock, if acquired at $100 per share, would prove to be a profitable investment.

The Eastern and Western Lumber Company was a close corporation. Its stock was not listed upon any stock exchange and sales of its shares occurred infrequently. It was difficult for a shareholder, who wished to sell, to acquire information indicative of the stock's value. One or more of the defendants generally assisted a stockholder who desired to dispose of his holding and in so doing thereby gained knowledge of the amount paid for the stock.

Had Mrs. Spangler known that the executive officers of the corporation were the ones who wished to purchase her stock, she might have attempted to discover the information about the company which had convinced them that, at a price of $100 per share, the stock constituted a good investment. It is probable that if she had been told that the executive officers were the buyers she would have concluded that since they believed that, at a price of $100 per share, the stock was a desirable purchase, she should keep hers.

We also think that the defendants had reason to believe that Mrs. Spangler would not have sold them the Buehner stock had she known that they were the purchasers. If the defendants had no doubt that they could have obtained, in face-to-face bargaining, the stock for the price actually paid, their resort to an agent was unnecessary. Duffy's testimony concerning the manner in which Mrs. Spangler was approached

reveals at the least that there was some hostility between her and the defendants. The following appears in the record:

"Q And why didn't you go to her?

"A Well, I think after the meeting in 1942 that I certainly wouldn't approach her after that * * *.

"Q Well, you knew she wanted to get out of the stock didn't you?

"A No, I didn't, I knew she was trying to sell it late in 1943, I knew she was trying to sell it, yes . . .

"Q Why didn't you go to see her then?

"A I didn't want to.

"Q I know you didn't want to, but why?

"A I can't tell you why."

As we have previously said, the defendants very likely had information concerning the company, its prospects and principal assets which other stockholders did not have. Whether they selected an agent to negotiate with Mrs. Spangler because they did not wish to arouse her suspicions concerning information of such a nature, or because there was hostility between them and her, or for some other reason, we are convinced that Mrs. Spangler would not knowingly have sold her stock to the defendants, and that the defendants sensed this. Therefore, we conclude that the misrepresentation of the defendants' identity was a misrepresentation of a material fact.

The evidence does not indicate that any of the defendants expressly authorized either Phillips or Hess and Butchart to employ deceit in inducing the plaintiffs to sell their stock, and it does not suggest that the defendants were aware, when the transaction was consummated, that Phillips had resorted to a fake telegram or to any other act of fraud in discharging

the commission with which they had entrusted him. However, a principal, who commits to an agent a duty, in the performance of which the agent will be required to make representations, is liable for misrepresentations made by him in the discharge of the duty which he employed in his efforts to serve his principal. The liability is incurred in much the same manner as the corresponding liability for the agent's negligence. Mechem on Agency, §§ 1984 and 1987. See, also, 3 CJS, Agency, § 236.

■ Restatement of the Law, Agency, § 259, gives us this rule:

"A transaction into which one is induced to enter by reliance upon untrue and material representations as to the subject matter, made by an agent entrusted with its preliminary or final negotiations, is subject to rescission at the election of the person deceived."

And § 263 says:

"Unless he has changed his position, a principal whose agent has fraudulently acquired property for him, holds it subject to the interests of the defrauded person."

*Sharkey v. The Burlingame Co.,* 131 Or 185, 282 P 546, and *Bank of Gresham v. Walch,* 76 Or 272, 147 P 534, illustrate the application of the principles of which we have just taken notice.

Since we have concluded that fraud for which the defendants are responsible was employed in inducing the plaintiffs to sell their stock, it becomes necessary to determine the nature of the relief to which the plaintiffs are entitled. The decree of the circuit court imposed joint and several liability upon the defendants in an amount approximating the liquidation value of the plaintiffs' stock, less the consideration which the

defendants had paid to the plaintiffs. The defendants, in challenging the decree, maintain that each of them should only be severally liable for the amount of the stock which he received upon the distribution among the four of the block of 2500 shares.

The complaint prayed for rescission of the sale of the stock, that the defendants be declared trustees of the plaintiffs' stock, that a trust be impressed upon some funds belonging to the corporation which still remained in Duffy's possession, and for an accounting. In their briefs, counsel have taken the position that whether the defendants are liable jointly and severally or only severally depends upon whether persons, who in concert wrongfully acquire and distribute property among themselves, are each jointly and severally liable as constructive trustees of the whole or only severally as constructive trustee of the part each acquired. It will be noticed that the issue debated by the parties does not quite meet the facts of this case, for the judgment actually rendered was a simple money judgment and no trust was impressed upon assets to which the defendants held title. Nevertheless, since constructive trust relief was sought by the plaintiffs, and since, as we shall show, that type of relief is based upon quasi-contractual principles, we think that the question presented is whether a joint and several money judgment can be rendered in accordance with such principles against joint wrongdoers who obtain property by fraud.

It is necessary at this point to take note of some additional facts. The defendants divided the Buehner stock among themselves in these amounts: Duffy, 949 shares; Koehler, 739 shares; Morrison, 737 shares; Ransom, 75 shares. It seems that the uneven division of the shares was made so that each of the four defendants would have, after account had been taken of

the number of shares held by each on the day of division, approximately the same number of shares. The stock was paid for by the defendants through a loan in the amount of $250,000 which they procured from the United States National Bank. The loan was evidenced by a promissory note in the sum of $250,000 which each of the four signed and in which each rendered himself liable jointly and severally for the entire debt. Payment of the note was secured by a pledge of the 2500 shares. The four defendants agreed among themselves that each should discharge the portion of the loan which was represented by the number of shares which he obtained in the distribution.

One reason which caused the defendants to purchase the Buehner stock was that its ownership would enable them to continue their control of the Eastern and Western Lumber Company. Due in part to his large stockholding Mr. Ayer, during his presidency of the Eastern and Western Lumber Company, had dominated the corporation. When Mr. Ransom succeeded Mr. Ayer, he and the other three defendants were the owners of less than a majority of the stock, but they commanded a majority vote through the fact that stock which Mr. Ayer had placed in trust with the United States National Bank was voted in accord with the shares which Ransom owned. The will of Mr. Ayer, which created the trust, instructed the bank, as trustee, to pursue that course. Shortly prior to February 8, 1944, Mr. P. S. Dick, president of the United States National Bank, called the attention of Mr. Duffy to the fact that before long the Ayer trust would terminate and that thereupon the shares which the bank held would be distributed to numerous individuals. He suggested to Duffy that the Buehner stock should be purchased by the defendants so as to

assure them continued control over the corporation. Possibly Mr. Dick's advice was unnecessary, for it appears that upon a previous occasion the defendants had sought to purchase the Buehner stock and had made inquiries at that time concerning a bank loan. However, shortly after Mr. Dick's counsel, the defendants purchased the stock. A desire to remain in command of the corporation was, therefore, a prime factor in persuading the defendants to purchase the Buehner stock.

This suit was presented to the circuit court upon the theory that the defendants jointly acquired and disposed of the plaintiffs' stock. We believe that the stock was disposed of when the corporation was liquidated, rather than when the defendants divided the shares among themselves. The division of the shares was little more than an anticipatory division of the proceeds that were realized upon liquidation, for, in accordance with the defendants' plan to reap the benefit from their purchase, joint action was necessary and it was pursued throughout. The defendants, acting continuously in concert, dealt wrongfully with the plaintiffs' stock from the time they acquired it until the liquidation of the corporation through the sale of its assets. Their liability to the plaintiffs should not be fragmented by an anticipatory division of the spoils. Consequently, they must be deemed liable for the value of the stock as of the time when liquidation occurred. Restatement of the Law, Restitution, §§ 151 and 154.

The question now presents itself: Is this a suit for rescission? The complaint employs terms that are suitable to pleadings of that kind and much was said in the trial court about rescission. Notwithstanding the fact that the first division of the complaint's prayer seeks relief, ''rescinding the sales and transfers of each

and all of the 2500 shares of Eastern  *  *  * '', the complaint itself disclosed that long before that pleading was filed the Eastern and Western Lumber Company had been dissolved. The decree recited ''That Eastern and Western Lumber Company having been dissolved and liquidated and its assets distributed to its stockholders  *  *  * and it being impossible for the defendants  *  *  * to return to the plaintiffs their said 2500 shares of capital stock  *  *  * '', a money judgment in the amount which is mentioned in a preceding paragraph was granted to the plaintiffs. Accordingly, both the complaint and the evidence made it manifest that the court could not enter a decree ''rescinding the sales and transfers of each and all of the 2500 shares'' of stock. If, when this case was filed, the printed sheets of paper which on February 7, 1944, had constituted the Buehner stock could somewhere have been found, they would have been mere scraps of paper or museum pieces—they would no longer have represented shares of stock. It is clear that the plaintiffs would not have accepted their return. Liquidation of the corporate assets was under way by the time the complaint was filed. The subject matter of this appeal is the money judgment which the trial court entered. Rescission in the ordinary form of undoing a transaction or of ordering ''a trading back'' was an impossibility when the proceeding was begun. This is not an instance in which the subject matter of a suit for rescission, in existence when the complaint was filed, was later destroyed. In this case, the defendants wrongfully acquired the plaintiffs' stock, were enriched by their conversion of it, and the plaintiffs, upon proving the value of the stock as of the time of liquidation, were awarded judgment in that amount. Before the stock was extinguished through the dis-

solution of the corporation, the plaintiffs had voiced no demand for rescission and, likewise, no demand for rescission was made in the complaint. The second division of the complaint's prayer follows:

> "Declaring that the defendants and each of them were and are trustees by their acts hereinbefore alleged of said 2500 shares of stock and * * *."

Constructive trust relief, rather than rescission, is the overtone of the plaintiffs' brief. If the defendants' fraud made them constructive trustees when they acquired the Buehner stock, no rescission was necessary and no court action was needed to bring about that result. Scott on Trusts, § 462.4.

■ In view of the pleadings and the evidence, we do not believe that this is a suit for rescission. By expressing that conclusion, we do not indicate that the plaintiffs are not entitled to relief. The victim of fraud is not confined to the remedies of rescission and an action for damages. The right to restitution presents the victim of fraud with many remedies among which he may make a selection. The opening paragraph of the plaintiffs' brief, in speaking of the nature of this proceeding, declares: "It is not an action for damages." The defendants appear to concur in that statement. Accordingly, since this is not an action for damages and was not maintained as one for rescission, we must go on and determine the basis for the judgment which was rendered.

■ One who has been defrauded and who seeks redress may choose any appropriate remedy. The choice of remedy is his and not that of the wrongdoer. Therefore, we are required to ascertain which of the available remedies the plaintiffs selected.

■ One of the difficulties in determining whether the awarded relief should be joint and several, or sev-

eral only, arises from uncertainty as to the theory upon which the case was tried in the circuit court. The facts stated in the complaint would have permitted recovery, as we have indicated, on several theories. Among the possible theories were deceit, conversion (obtaining property by fraud is conversion: Prosser on Torts, pp 101-102; Woodward, Law of Quasi Contracts, § 278), money had and received, the recovery of specific property by constructive relief, or any other theory within the scope of restitution.

The theory which the plaintiffs' brief most actively espouses is that of holding the defendants jointly and severally liable as constructive trustees. The principles governing constructive trust relief are set forth in an excellent manner in Restatement of the Law, Restitution, §§ 160 through 215; see especially §§ 160 and 166. The plaintiffs submit: (1) the defendants held title to the stock from the day of its purchase; (2) the nature of the title was that each held a fractional interest in the stock, more specifically in each share of the stock; (3) since the defendants obtained the stock by fraud, they were constructive trustees of the stock and were under a duty to return it to the plaintiffs; (4) each was under a duty to return every share in which he owned a fractional interest; (5) the defendants have failed to return the stock, and, hence, as co-constructive trustees, they are all jointly and severally liable.

 The reasoning which the plaintiffs pursue, and which is epitomized in the preceding paragraph, overlooks the essential feature of a constructive trust. A constructive trust is merely a procedural device to which the courts resort in order to effect restitution of property in specie. It is not a part of the substantive law. Its place is in the law of remedies.

Through the employment of the device, unjust enrichment is prevented. The relief which is afforded in that manner is based upon unjust enrichment and quasi-contractual principles. Those principles give to us what the American Law Institute terms the law of restitution. The latter, in its efforts to afford the victim a remedy, frequently resorts to an action of assumpsit or relief by way of constructive trust. We take the following from Restatement of the Law, Restitution, § 160:

> "Where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it, a constructive trust arises."

The Comment which follows the rule clarifies its meaning. We quote from it the following:

> "The term 'constructive trust' is not altogether a felicitous one. It might be thought to suggest the idea that it is a fiduciary relation similar to an express trust, whereas it is in fact something quite different from an express trust. An express trust and a constructive trust are not divisions of the same fundamental concept. They are not species of the same genus. They are distinct concepts. A constructive trust does not, like an express trust, arise because of a manifestation of an intention to create it, but it is imposed as a remedy to prevent unjust enrichment. A constructive trust, unlike an express trust, is not a fiduciary relation, although * * *.

> "It is true that both in the case of an express trust and in that of a constructive trust one person holds the title to property subject to an equitable duty to hold the property for or to convey it to another, and the latter has in each case some kind of an equitable interest in the property. * * *

> "* * * A constructive trust is imposed not because of the intention of the parties but because

the person holding the title to property would profit by a wrong or would be unjustly enriched if he were permitted to keep the property. * * *

"A constructive trust is imposed upon a person in order to prevent his unjust enrichment. To prevent such unjust enrichment an equitable duty to convey the property to another is imposed upon him. * * *"

We take the following from Scott on Trusts, § 461:

"The general principles with reference to unjust enrichment which are at the basis of constructive trusts and the analogous equitable remedies of equitable lien and subrogation are also at the basis of quasi-contractual obligations. The chief difference is that quasi-contractual obligations are ordinarily enforceable by an action at law, the purpose of which is to impose a personal liability upon the defendant; whereas the enforcement of a constructive trust is by a proceeding in equity to compel the defendant to surrender specific property. * * *"

The same treatise, in § 462, declares:

"A constructive trust arises where a person who holds title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it. * * * He is not compelled to convey the property because he is a constructive trustee; it is because he can be compelled to convey it that he is a constructive trustee."

Bogert on Trusts and Trustees, § 471, referring to a constructive trust, says: "It is merely a tool of the court to work out an equitable result in the simplest fashion."

Accordingly, we repeat, a constructive trust is

simply a procedural device. A constructive trust does not create in the party favored by it any new substantive rights. Its sole purpose is to enable the courts to afford the victim of the wrong relief in specie. In instances in which the law employs a constructive trust, the doctrine of unjust enrichment governs generally the substantive rights of the parties.

Notwithstanding the nature of a constructive trust which, as we have seen, enables a court to lay hold of an item of property in the possession of one who gained it wrongfully, the plaintiffs argue that a decree can be entered in constructive trust cases involving constructive trustees which will require one or more of them to yield up, not only the item which he personally possesses, but also items which the other co-constructive trustees possess and over which he has no control. Or, stated in the terms which the plaintiffs impart to this case, they claim that if a co-constructive trustee has only a half interest in a given share of stock he can be ordered to return not only the half share which he possesses, but also the other half interest which his co-trustee possesses. The plaintiffs, in support of their position, cite: *McMynn v. Richardson-Phenix Co.,* 186 Wis 442, 201 NW 272; *Saville v. Sweet, Hayes and Taylor,* 234 App Div 236, 254 NYS 768; *General Proprietors of Eastern Division of New Jersey v. Force's Executors,* 72 NJ Eq 56, 68 A 914; *Bigelow v. Old Dominion Copper M. & S. Co.,* 74 NJ Eq 457, 71 A 153; *Marcus v. Otis,* 168 F2d 649 (CCA2d) (1948); *Eshleman v. Keenan,* 21 Del Ch 259, 187 A 25; *Harrigan v. Gilchrist,* 121 Wis 127, 99 NW 909; *Driscoll v. Burlington-Bristol Bridge Co.,* 8 NJ 433, 86 A2d 201; *Muellhaupt v. Strowbridge Estate Co.,* 136 Or 106, 298 P 189; 54 Am. Jur, Trusts, §§ 189 and 218; 3 Bogert on Trusts, § 471; 1 Perry on Trusts, §§ 166-167;

Restatement of the Law, Trusts, § 224(2); *Jose v. Lyman,* 316 Mass 363, 55 NE2d 433, 154 ALR 190.

We do not think that any of the above-cited authorities are at variance with the reasoning employed by us in the preceding paragraphs. We shall set forth an analysis of only two of the decisions upon which the plaintiffs-respondents rely. One of them is *Driscoll v. Burlington-Bristol Bridge Co.,* supra. In that case, the objects of the suit for rescission, two interstate bridges, were in existence when the suit was filed, remained in existence during the trial and, no doubt, are still extant today. Again, that was not a suit between stockholders nor one between co-directors. It was a proceeding instituted by the Governor and the Attorney General of New Jersey to set aside the fraudulent purchase of two bridges by the Burlington County Bridge Commission, a public corporation. The latter purchased the bridges from a private corporation entitled Burlington-Bristol Bridge Company, one of the defendants in the case. The officers of the selling corporation, the local board of freeholders which created the bridge commission, and the members of the bridge commission knew that the purchase of the two bridges by the clandestinely created bridge commission was inimical to the public interest. About two years before the fraudulent transaction was consummated, a group of individuals, who were familar with the bridges, envisoned a profit of approximately four million dollars if they would form themselves into a syndicate, purchase the bridges, induce the local board of freeholders to create a bridge commission and then, after appointment of the bridge commissioners, sell the bridges to the commission upon terms prescribed by the syndicate. Concealment and secrecy were deemed by them essential to the success of their venture. Ac-

cording to the decision, the transaction was consummated in the planned manner. Secrecy was everywhere employed and the public officials, in abandonment of their duties, submitted completely to the will of the adventurers. In a period of 48 hours the board of freeholders created the bridge commission, appointed its membership, the commission purchased the bridges at a price of twelve million dollars, and the latter at once issued twelve million dollars in bonds to a bond syndicate which the selling syndicate had organized. The scheme as devised by the selling syndicate was fulfilled by the docile public officials without question. The decision, in holding the transaction fraudulent, illegal and voidable, said: "The transaction was that of the county and the bridge commission in form only." As a result of the transaction, the members of the selling syndicate and their associates derived a profit of approximately four million dollars. Five members, who constituted the masterminds of the selling syndicate, were held jointly and severally liable for the results of their fraudulent acts. The remaining defendants were rendered severally liable only. In holding the five jointly and severally liable, the decision cited *Bigelow v. Old Dominion Copper M. & S. Co.*, 74 NJ Eq 457, 71 A 153, which held two promoters of a corporation jointly and severally liable for a secret profit which they had made in the organization of the corporation. The two were deemed fiduciaries and trustees. It is apparent that the relationship of the five individuals in the bridge case, who were held jointly and severally liable, was deemed tantamount to that of the promoters in the Bigelow case. In other words, they were regarded as fiduciaries and trustees. As we have seen, the bridge commission had issued bonds in order to acquire the bridges. Since most of

the bonds were held by bona fide purchasers whose rights would be impaired if the transaction were completely undone, the decision under review rescinded the transaction in part only. It left the bridges in the ownership of the bridge commission, but held that those who had transferred the bridges to the bridge commission should be given credit upon the judgment entered against them for the reasonable value of the bridges. Thus the wrongdoers, instead of getting back the bridges, received credit upon the judgment entered against them for the value of the bridges. We found nothing in this decision which indicates that a proceeding for constructive trust relief may be instituted after the subject matter of the challenged transaction became nonexistent, or that co-constructive trustees are jointly and severally liable.

*Marcus v. Otis*, supra, was a shareholder's derivative suit against defendants who for the most part were directors of a corporation in which the plaintiffs held an interest. The defendants had converted to their use funds of the corporation and with them had purchased for themselves stock of another corporation. The purchased stock advanced in value, and those of the wrongdoers who sold their stock realized a profit. Each individually repaid his part of the converted money but kept the profit. The court throughout its decision deemed the defendants fiduciaries and trustees. It held them liable as constructive trustees, but seemingly deemed each liable only for the profit which he had received through the wrongful use of the corporation's money. After the court had so ruled, it added to the relief which it granted a feature for which it found it difficult to cite authority. It rendered each defendant secondarily liable as guarantor for the recovery from all of the defendants of the total profit.

The sole authority which it mentioned for that feature was *Cahall v. Lofland,* 12 Del Ch 299, 114 A 224, but, in citing that case, the decision said: ''It is not clear whether in *Cahall v. Lofland* the chancellor proceeded on this theory.'' Apparently the court's reason for rendering each a guarantor was that the defendant fiduciaries would have been liable jointly and severally for the entire sum had they been sued in some other form of action, and the court did not wish them to be favored by the form of action in which the case was cast. It will be observed that in that case the defendants were fiduciaries when they helped themselves to the corporation's money.

In the first of the two above cases, the wrongdoers were held liable as fiduciaries who had induced public officials to betray their trust. In the second, the court declined to afford trustees an opportunity to avoid, through the form of the proceeding, the full extent of their liability. If a suit for constructive trust relief could be filed against an alleged wrongdoer after the subject matter of the questioned transaction had become nonexistent, an effective means would thereby be provided for denying, at the behest of the plaintiff, trial by jury; and yet the court would be powerless to grant any equitable relief. The two decisions just reviewed contain no intimation that existence of the subject matter of the challenged transaction at the time suit is filed is not essential to the maintenance of the suit.

We shall not go on and review herein the other decisions cited by the plaintiffs-respondents. They are listed in a preceding paragraph of this opinion. In all of them, with the exception of *Muellhaupt v. Strowbridge Estate Co.,* supra, the wrongdoer was a fiduciary. The Muellhaupt case arose out of a family

corporation. It will be recalled that two of the decisions which the plaintiffs-respondents cite are *Harrigan v. Gilchrist* and *General Proprietors of Eastern Division of New Jersey v. Force's Executors*. Section 862 of Bogert on Trusts and Trustees cites those two decisions among others in support of the following statement:

> "If several trustees unite in a breach of trust, they are jointly and severally liable, and the entire claim of the cestui may be satisfied from the property of one trustee. In the words of a New Jersey court: 'A liability to make good a loss resulting from a breach of trust participated in by more than one trustee is both joint and several, so that each guilty trustee is liable for the whole of the loss.' "

We do not think that anything is gained by taking note of the liability of express trustees. Bogert, at the end of the passage which we quoted from his volume, continues in this way:

> "But where several persons are constructive trustees each is liable only for the amount of property coming into his hands."

In support of that statement, he cites *Hunter v. Hunter*, 50 Mo 445, and *Keenan v. Scott*, 78 WVa 729, 90 SE 331. We think that there can be added to those citations *Eisenstraut v. Cornelius*, 134 Wis 532, 115 NW 142.

Express trustees can properly be held to strict accountability and a high degree of duty. The purpose of creating the procedural device known as a constructive trust was not to effect a change in the substantive law and place the trustee of a constructive trust upon the same level as that of a trustee of an express trust. Its purpose was to afford the victim of a tort who

had been deprived of some of his property an effective means of securing the return of his property.

██ We conclude that the joint and several judgment from which this appeal was taken cannot be sustained on the constructive trust theory which the plaintiffs invoke. The decree granted no relief of that kind. But it does not follow that the judgment must be reversed, for, in our opinion, it can be upheld upon any theory which stems from the right to restitution. Restitution is within the pleadings and the course which was pursued during the trial. The gravamen of the complaint was that the defendants wrongfully acquired title to the plaintiffs' stock, and were unjustly enriched thereby. The stock has been consumed, but the plaintiffs can be awarded a judgment for the value it possessed at the time of liquidation, less the consideration paid. Unless such a judgment is entered, the defendants will be unjustly enriched. The measure of recovery is the same as under the theory which was pursued at the trial, namely, the liquidation value of the stock. The principles underlying (a) constructive trust relief and (b) the doctrine of unjust enrichment are the same, namely, the quasi-contractual obligation to make restitution.

The authorities are in conflict as to whether the obligation of joint tort-feasors to make restitution is joint and several for the amount of property which all receive or only several for the amount which each receives. Woodward, The Law of Quasi Contracts, maintains that the obligation of joint tort-feasors in assumpsit is several and only for what each receives. We quote the following from § 289 of his text:

> "In England, the liability of joint tort-feasors is joint; in America, joint and several. In either view, of course, no attention is paid, in assessing

damages, to the actual division of the spoils. But
what if the injured party elects to sue in assumpsit
for restitution instead of trespass for damages?
Clearly, he is not entitled to a joint judgment if
one of the wrongdoers has derived no benefit from
the commission of the tort; nor is he entitled to a
joint judgment, if each has received a benefit, for
the sum of the benefits separately received by them.
The obligation to make restitution is essentially
several, each tort-feasor being liable to the extent
of the benefit received by him. Even if the pro-
ceeds of the tort are not divided, but are held by
one of the tort-feasors for the benefit of all, or by
a common agent, it would seem that each should
be answerable only to the extent of the value of his
interest in the booty. It has been held that 'if the
money was received by a common agent, those for
whose benefit it was thus received were jointly
liable for the whole sum,' but since a joint judgment
is enforceable in full against any one obligor, this
rule would permit the collection of the entire pro-
ceeds of the tort from one who has only a frac-
tional interest therein—a violation of the funda-
mental principle which underlies the tort-feasor's
obligation in assumpsit.''

Keener on Quasi-Contracts, pages 199-202, takes the
same view. Neither Woodward nor Keener cite any
decisions supporting their views which involved an
action in assumpsit against joint tort-feasors. They
argue on principle. In expressing himself, Keener
says:

''* * * If, however, a wrong-doer is not liable
in quasi-contract unless he has received some part
of the plaintiff's property in the commission of the
wrong, the extent of his liability would seem neces-
sarily to be limited to that, which he has received.
* * * Of course it is not necessary that the prop-
erty come into the physical possession of the de-
fendant; it is sufficient if it has been received for
him by another acting under his authority. And the

fact of his agent's having absconded would constitute no defence. But where that which has in fact been received by another is received only in part for the defendant and the action is not in tort, to use the language of Rapallo, J., in National Trust Co. v. Gleason, being 'only an item of evidence tending to establish his interest in the proceeds,' it seems that on principle the extent of his interest in the property should be the limit of the recovery against him. If this view is correct, then his liability should be several, and not joint, or joint and several; * * *.''

At that point the text analyzed *City National Bank v. National State Bank,* 32 Hun, 105, in which the defendant counterclaimed for the amount of a loan which it had made to an officer of the plaintiff bank. The counterclaim was based upon averments that the officer, being indebted to the plaintiff, the two thereupon entered into a conspiracy to deceive the defendant into making a loan to the officer upon the security of worthless paper. In that manner, according to the counterclaim, a loan in the amount of $25,661 was procured by the officer from the defendant. Of that sum the officer paid the plaintiff $13,000 and kept the remainder. The trial judge held that liability was joint and that since the officer was not a party to the proceeding, the action must be dismissed. In reversing, the appellate court ruled:

"* * * We think the implied contract in such case which arises upon waiver of an action for tort is joint and several, and not joint alone. Such was the nature of the tort, and each party could have been separately sued upon it; and the same reason extends to the implied contract. Either conspirator may be sued upon his implied promise, and be made to answer for the whole of the money obtained by the fraud consummated under the conspiracy.''

Keener agrees that the plaintiff was liable for the $13,000 which it received from the fraudulently induced loan. He then states:

"So far as the case holds that the liability is several, it should and would be followed. It does not result from this suggestion that the tort feasor into whose possession the property is actually traced can reduce the amount of his liability by showing that he has transferred the property in whole, or in part, to another, for whom he always held the whole or a part of it. The moment it actually came into his possession the obligation was imposed upon him of restoring it to the plaintiff; and that obligation he cannot escape by otherwise disposing of the property."

That observation appears to be applicable to the situation submitted by the case at bar.

In *Minor v. Baldridge,* 123 Cal 87, 55 P 783, the defendants were a corporation and its agent. The plaintiff was induced to pay money to the corporation by the false representations of its agent. The latter neither received nor ever possessed any of the money. Plainly, the agent would have been liable in an action for deceit, but since he did not receive the money and never possessed any of it, the court held that he was not liable in an action for money had and received. Woodward cites that decision in support of his views. It seems clear that a joint tort-feasor must receive some benefit before he can be held liable by one who waives the tort and sues in assumpsit. *Minor v. Baldridge* did not hold that a joint tort-feasor who received a benefit is liable in assumpsit only to the extent that the benefit was exclusively his or enhanced his total assets.

In *Pollak v. Stanton,* 210 Cal 656, 293 P 26, an action for money had and received, the defendants, after

fraudulently obtaining the stock of the plaintiff, sold it and divided the proceeds among themselves. The court accepted the views of Woodward and Keener and held that the liability of each wrongdoer was limited by the amount of the spoils which he received.

It will be recalled that Woodward, in the passage which we quoted from his treatise, says: "It has been held that 'if the money was received by a common agent, those for whose benefit it was thus received were jointly liable for the whole sum,' ''. The language which he quoted was taken by him from *National Trust Co. v. Gleason,* 77 NY 400 33 Am Rep 632. The decision was written by Rapallo, J. After the language which Woodward quoted, Judge Rapallo added: "and this result would not be varied by the circumstance that the common agent failed to account, and absconded with the proceeds." Woodward also cites *Neate v. Harding,* 6 Exch 349. In that case the two defendants went to the plaintiff's home and one entered. The other defendant (Bowns) remained outside. The one who entered found 163 pounds which he thereupon wrongfully took. When he had returned outside he was joined by the other defendant and the two presently deposited the money to their joint account in a bank. Judgment was entered against the two for the entire sum which was converted. The form of the action was for money had and received. In holding that there was no error, Chief Baron Pollack declared:

> "The mere presence of the defendant Bowns might not have sufficed to render him liable; but there is evidence that he concurred in placing the money in the bank in the joint names."

Baron Parke was of like opinion. He held:

> "All that is necessary is, that the plaintiff should have a right to waive the wrongful act; then the

defendants, having got the money of the plaintiff in their hands, must pay it back to him again.''

Baron Martin, who agreed that there was no error, expressed this view:

"But when it was proved, as in this case, that after the money was taken both defendants went and paid it into the bank on their joint account, that makes them both responsible as upon a contract * * *; and therefore I think that the action for money had and received is maintainable.''

The court found no error.

*New York Guaranty, etc. Co. v. Gleason,* 78 NY 503, is a companion to *National Trust Co. v. Gleason,* supra, and reached the same result as that case.

*Gould v. Baker,* 12 Tex Civ App 669, 35 SW 708, ruled that two persons, who, acting together, stole the plaintiff's money, were liable therefor in assumpsit. *Gilmore v. Wilbur,* 12 Pick 120, held that two persons, who sold timber which they had wrongfully cut from the plaintiff's land, were liable in an action for money had and received. The nature of the liability of joint tort-feasors in assumpsit was not discussed in those two cases, but in the second the defendants contended that they were improperly joined.

The following is taken from 4 Am Jur, Assumpsit, § 33, p. 521:

"* * * Where a person from whom money has been wrongfully obtained waives the tort and sues in assumpsit for money had and received, a joint action can be maintained only against those persons who jointly received the money, and persons who did not jointly receive the money cannot be joined as defendants, though an action in tort might be maintained against them together with those who actually received the money from the plaintiff; but if the money is received by the several

defendants jointly, a joint action for money had and received may be maintained against them, although they may have divided the money according to some agreement among themselves."

Concerning the liability of persons who jointly receive money wrongfully in a nontortious manner, 58 CJS, Money Received, § 23, p 929, declares:

"Where money is received on the joint account of several defendants they are jointly liable; * * *."

*Holtz v. Olds,* 84 Or 567, 164 P 583, 164 P 1184, tends slightly to indicate that liability is joint and several in an action for money had and received if the money was jointly received by several defendants. There, the plaintiffs sued to recover $20,000 which they had deposited with the defendants pursuant to an agreement to purchase stock under a contract which they claimed was void for uncertainty. Upon appeal from a judgment for the defendants, this court held that the agreement to purchase was void for uncertainty and remanded the cause for entry of judgment against the defendants in the sum of $20,000, together with costs. The decision made that order without discussing the nature of the liability. Evidently the court took it for granted that liability was joint and several.

*Ulbrand v. Bennett,* 83 Or 557, 163 P 445, appears to stand for the proposition that joint converters are jointly and severally liable in assumpsit. The plaintiff in that case had sustained a personal injury in the plant of his employer, as a result of which he had a claim against him. The defendant Bennett undertook to secure a settlement of the plaintiff's claim and in order to do so secured a power of attorney from the plaintiff which authorized him to settle the claim; but it did not empower him to disburse any money received

upon a settlement. The other defendant, Smith, had served the plaintiff as physician and seemingly had made a charge for his services. Eventually, Bennett effected a settlement and received two checks, one for $500 and the other for $2,800. He wrongfully endorsed the plaintiff's name to the $500 check, cashed it and pocketed the proceeds. Neither the plaintiff nor the defendant Smith received any part of that money. Then Bennett handed to defendant Smith the $2,800 check and recommended that he endorse the plaintiff's name upon its back, keep $500 for himself and draw a check in payment of the plaintiff's hospital bill and one to the plaintiff for the balance, $2,100. Smith complied with the suggestion, and thus the plaintiff received only $2,100 of the settlement money. The defendant Smith was held liable for the money belonging to the plaintiff which he received and failed to pay to him ($2,800 minus $2,100, that is, $700). Concerning the $2,800 check of which $700 was withheld from the plaintiff by the defendant Smith as well as by the defendant Bennett, there is language in the decision which seems to indicate that Smith's liability in assumpsit was premised upon a wrongful exercise of dominion over the check, rather than over only the fractional amount of $700. For example, the opinion contains this statement:

" * * * On the other hand, the fact that at the instance of Bennett the defendant Smith took into his possession the voucher drawn in favor of Ulbrand and disposed of the proceeds partly in his own interest and partly for the benefit of third parties giving a portion only to Ulbrand is evidence that the two defendants collaborated in this disposition of funds belonging to the plaintiff. The two acted together in realizing upon the voucher to the extent of $2,800 of which Ulbrand has received only $2,100."

The authorities which maintain that where there has been a division of the spoils a joint tort-feasor's liability in assumpsit is only several and is limited to the benefit which he kept, in our opinion, rests on too narrow an interpretation of the term "benefit". If each tort-feasor has possession of and exercises dominion and control, with his fellows, over the victim's property, he thereby uses and benefits from the whole. We believe that where joint tort-feasors divide the spoils, each, as regards liability, benefits to the extent of the entire amount which they wrongfully appropriated, even though the assets of each upon subsequent division are not increased to an extent equal to the value of the whole. How the group eventually disposes of the property which was taken is immaterial. It is the wrongful appropriation by the entire group of tort-feasors which creates the duty to return.

In the present case, all of the four defendants came into possession jointly of the Buehner stock. They did so when Mrs. Spangler and her attorney delivered the stock upon their orders to the United States National Bank for them. When that had been done the plaintiffs received $250,000 and thereupon they parted completely with control over the stock. The latter was then subject to the defendants' joint dominion and control. At that point, as we shall presently show, the four defendants, all of whom were present in the bank, jointly exercised control and dominion over the entire block of 2500 shares. Had this proceeding been instituted on that day, there can be no doubt but that the four defendants would have been deemed jointly and severally liable in any judgment or decree which would have been entered. While the block of 2500 shares was in the bank, subject to the control and directions of the four defendants, the latter directed

that the old certificates be cancelled and that new ones be issued to them in the denominations mentioned in a preceding paragraph. Their orders were obeyed and the new certificates were issued. When the new certificates were issued, the defendants jointly made use of them. First, they pledged the certificates to the bank as security for their joint and several note in the amount of $250,000 which we have mentioned. Next, they made joint use of the stock in the consummation of their purpose to dominate and control the corporation. The breaking up of the Buehner stock into four certificates was, as we have said, nothing more than an anticipatory division of the eventual liquidation proceeds. We believe that no error was committed when the defendants were deemed jointly and severally liable.

We shall now consider the jurisdiction of the court of equity to have rendered the challenged money judgment. Generally, a complaint which seeks to impeach a transaction upon charges such as fraud, duress or mistake, and which prays for relief, such as was sought in this case, suffices to confer jurisdiction upon an equity court. Moreover, the subject matter of this suit, shares of stock in a closely held corporation, was suitable for equity's jurisdiction, for such courts have jurisdiction when a plaintiff seeks recovery of a unique chattel. Accordingly, the complaint in this case conferred jurisdiction upon the equity court, provided nothing was included in it which indicated a lack of jurisdiction. The complaint, however, averred that before the suit was filed the Eastern and Western Lumber Company had been dissolved. Therefore, before the suit was filed, rescission had become impossible.

Unless the transaction averred in the com-

plaint is wholly outside equitable cognizance, a defendant who wishes to challenge the jurisdiction of the court must do so promptly; and, normally, his objection comes too late if it is made for the first time after the trial has begun. 30 CJS, Equity, § 86, p 447.

ORS 16.260 says:

"The defendant may demur to the complaint within the time required by law to appear and answer, when it appears upon the face thereof:
"(1) That the court has no jurisdiction of * * * the subject of the action; * * *."

In *Hudson v. Goldberg,* 123 Or 339, 262 P 223, it is said:

"It is settled law in this state that an objection to the jurisdiction in equity in the absence of a demurrer on the ground that plaintiff has a plain, adequate and complete remedy at law comes too late, after the defendant has by his answer put himself upon the merits, where the pleadings suggest no such defense: * * *."

The Goldberg decision cites five earlier holdings of this court. See, also, *Ward v. Town Tavern,* 191 Or 1, 228 P2d 216; *Yellow Mfg. Accept. Corp. v. Bristol,* 193 Or 24, 236 P2d 939; *Nusshold v. Kruschke,* 176 Or 697, 159 P2d 819; *Hudson v. Portland & Southeastern Ry. Co.,* 107 Or 187, 211 P 897, 213 P 408; and *Gantenbein v. Bowles,* 103 Or 277, 203 P 614. Other jurisdictions employ the same rule as the one which received application in the Hudson case. See Clark on Code Pleading, 2d ed, p 520; 41 Am Jur, Pleading, § 213, p 443; and 30 CJS, Equity, § 87, point 71. Although the defendants filed a demurrer, the latter did not challenge the equity jurisdiction of the court; nor did the defendants challenge the court's jurisdiction by any averment of their answer. To the contrary, the

answer plead laches. The equity court, therefore, had jurisdiction to enter the challenged judgment.

The above disposes of all contentions submitted by the defendants. It does not mention some of the numerous authorities cited in their exhaustive briefs, but all received attention.

The challenged decree-judgment is affirmed, but credit will be given for the Ransom payment which we have mentioned.

Affirmed, less credit application.

BRAND, J., concurs in the result.