Argued and submitted June 22, 2000, judgment of adoption vacated; remanded with instructions to dismiss adoption proceeding and for further proceedings on remaining custody and support issues raised in father's filiation proceeding January 24, respondent PLAN International's petition for reconsideration filed February 7 denied and respondent Dunns' petition for reconsideration filed February 7 allowed by opinion March 28, 2001
See 173 Or App 225 (2001)

In the Matter of the Adoption of
Alexandra Rose Nesbitt, a Minor Child.

Carl O. GRUETT,
*Appellant,*

*v.*

Jaysa NESBITT,
*Respondent,*

*and*

PLAN INTERNATIONAL ADOPTION SERVICES, INC.,
an Oregon corporation,
David Dunn and Elizabeth Dunn,
husband and wife,
*Third-Party Respondents - Respondents.*

(97-5353-B-2 and 98-2454-F-2; CA A103925)

17 P3d 1090

Michael A. Neal argued the cause for appellant. Brian A. Buchanan filed the brief.

James A. Wallan argued the cause for third-party respondents - respondents David and Elizabeth Dunn. With him on the brief was Hornecker, Cowling, Hassen and Heysell, L.L.P.

No appearance for respondent Jaysa Nesbitt.

No appearance for third-party respondent - respondent PLAN International Adoption Services, Inc.

Before Haselton, Presiding Judge, and Deits, Chief Judge,* and Wollheim, Judges.

HASELTON, P. J.

---

* Deits, C. J., *vice* De Muniz, P. J.

### HASELTON, P. J.

The biological father (father) of Alexandra Rose Nesbitt (child) appeals from a directed verdict in favor of the Dunns (adoptive parents) in a consolidated filiation and adoption proceeding that resulted in the entry of an adoption judgment. Father asserts that the trial court erred in holding that the adoption could proceed notwithstanding fraudulent conduct by the adoption agency. Adoptive parents respond that the trial court correctly applied the relevant statutes and properly determined that fraud by the adoption agency could not be imputed to the adoptive parents. For the reasons explained below, we vacate the judgment of adoption and remand the case to the trial court for dismissal of the adoption petition and for resolution of the remaining issues in the filiation proceeding.

We review the facts *de novo*, ORS 19.4151(3), and the legal issues for errors of law. Father had a sexual relationship with birth mother, and, in early 1997, he discovered that she was pregnant. Birth mother asked father to take her to get an abortion, but he was unwilling to do so and encouraged her to consult her mother. Birth mother's mother assisted birth mother in attempting to procure an abortion and requested $400 from biological father. Father gave birth mother the money, but she did not get an abortion. Father offered to provide further support to birth mother during the pregnancy, but his offers were refused.

Also in early 1997, adoptive parents met with representatives of PLAN International Adoption Services (PLAN) and entered into an agreement for adoption services, paying several thousand dollars in fees. Under that agreement, PLAN was to attempt to refer a child to adoptive parents for adoptive placement and to facilitate adoptive parents' adoption of that child.

In August 1997, father was contacted by Horner, a PLAN counselor, about child's adoption through PLAN. Horner told father that birth mother had named him as the father of the expected child, and father affirmed that it was his child. Father indicated to Horner that he was interested in keeping child, and Horner advised him that he needed to

get an attorney. Horner also told father that PLAN would send him a letter telling him what he had to do.

On September 12, 1997, father received a certified letter from PLAN that stated that child was due on or about October 16, 1997, that birth mother intended to relinquish child for adoption, and that, if father was not in agreement with the adoption, he needed "to contact an attorney as soon as possible to initiate filiation proceedings." The letter further stated: "If I do not hear from you or an attorney acting on your behalf within 14 days of your receipt of this letter, PLAN Adoption International Services will proceed with the plan to place the child in an adoptive home." The letter also provided two telephone numbers for father to call. Father and his parents tried on numerous occasions to reach PLAN through those numbers, but one number was incorrect and the other was answered by a recording machine. Although several messages were left for Horner at that number, Horner denied ever receiving them.

On September 22, 1997, birth mother gave birth to child. Father and his parents went to the hospital to see child that evening, but were told they could not see her because she was being placed for adoption. That night, PLAN contacted adoptive parents about adopting child.

The next day, September 23, father's mother contacted an attorney about initiating a filiation proceeding and preventing the adoption. The attorney's staff tried unsuccessfully to contact PLAN. Meanwhile, Horner and adoptive parents came to the hospital and completed all the necessary paperwork with birth mother for the placement of child with adoptive parents. Adoptive parents were aware at that point that father had attempted to see child but were told, incorrectly, that he was not permitted to see child because of a restraining order. Adoptive parents also were told that father had received a notice that he had 14 days from September 12—or until September 26—to object to the adoption. However, PLAN director Linda Vollman assured adoptive parents that, although the notice period had not run, it was not legally binding. Adoptive parents understood that father was attempting to prevent the adoption. Adoptive parents also spoke with PLAN's attorney, Custis, who assured them that

everything was fine and that PLAN would take care of legal issues concerning father. Thus, although adoptive parents understood that father was attempting to prevent the adoption, they chose to go forward with the placement, based, in part, on the PLAN representatives' assurances.

On September 24, father initiated filiation proceedings in Linn County Circuit Court, and birth mother, PLAN, and PLAN's attorney Custis were served with notice of that proceeding. Horner, the PLAN counselor, was present with birth mother when she was served. Horner had been in touch with Vollman, her supervisor, and also with PLAN's attorney, Custis, and knew through them of father's objection to the adoption. Adoptive parents became aware of the existence of the filiation proceeding either on September 24 or the following day, but were uncertain about the nature of the proceeding or how it could affect their adoption of child. The hospital released child to adoptive parents on September 24, and adoptive parents took child to their home. PLAN urged adoptive parents to act immediately and file the adoption papers. Adoptive parents obtained a post-placement report from a PLAN social worker on September 26 in order to expedite the adoption.

On September 26, father's notice of filing of filiation proceedings was filed with the Vital Statistics Unit in Salem. Also on that date, father moved in the filiation proceeding to stay any adoption proceeding concerning child pending the outcome of the filiation proceeding. On October 1, father amended his petition in the filiation proceeding, seeking custody of child as well as seeking to establish paternity. At the same time, he sought a restraining order to prevent PLAN from taking any action to facilitate adoption of child.

On October 1, adoptive parents retained PLAN's attorney, Custis, to file an adoption petition for them. On October 7, Custis filed the adoption petition in Jackson County Circuit Court. The petition alleged father's identity but, citing ORS 109.092 and ORS 109.096(3), asserted that he had statutorily waived any objection to the adoption. Adoptive parents also submitted a "Confidential Adoption Report" and the notarized affidavit of Vollman dated September 30, 1997, which was incorporated by reference into the

adoption petition. Those documents stated respectively that the *"paternity of this child has never been established nor have any proceedings been instituted to establish paternity,"* and that father *"had not filed filiation proceedings in Oregon or in any other state."* (Emphasis added.) Father received no notice of the adoption proceeding.

On October 13, Custis, as attorney for PLAN, moved to dismiss father's amended petition in the Linn County filiation proceeding on the ground that father had no standing to bring such an action because his notice of filing of the filiation proceeding was not on file with the Vital Statistics Unit in Salem at the time PLAN placed the child with adoptive parents. ORS 109.096(3). On October 28, 1997, the Linn County Circuit Court entered a temporary restraining order restraining PLAN and its agents from taking any action to facilitate the adoption of child. Father attempted to obtain records from PLAN to discover the identities of adoptive parents, but PLAN moved to quash his subpoena. On November 10, Custis acknowledged to the Linn County Circuit Court that adoption proceedings were pending in another county, and the trial court ordered him to disclose the existence of the filiation proceeding to the court where the adoption was pending. Subsequently, father was permitted to amend his petition to join adoptive parents as "John and Jane Doe, husband and wife," as their identities had not been revealed to him.

On November 25, 1997, the Linn County Circuit Court ruled that PLAN's placement of child with adoptive parents "violated ORS 109.096(8) and [father's] due process rights under the Constitution of the United States." The court ordered that the filiation proceeding proceed and that "all activities relating to the potential adoption" of child cease pending further order of the court. The court also ordered that PLAN's records relating to the adoption be turned over to the court.

In early 1998, father discovered the identities of adoptive parents and moved to substitute their names for the "John and Jane Doe" named in his petition. He also filed an objection to the adoption in the Jackson County proceeding and requested notification of further proceedings. At about

the same time, adoptive parents retained their own attorney who appeared on their behalf in the Linn County filiation proceedings. That attorney already was representing them in the Jackson County proceeding, where he was taking the position that the Linn County stay was not binding on the Jackson County court and that the adoption should proceed. It appears that adoptive parents' motion in the Jackson County Circuit Court was heard without notice to father. The Jackson County Circuit Court set the matter for trial in July 1998.

In March 1998, all parties to the Linn County filiation proceeding stipulated to an order for blood testing of father, birth mother, and child. Adoptive parents and birth mother, however, subsequently refused to comply with the order, and the Linn County proceedings were delayed. Eventually, blood tests confirmed that father was child's biological father, and in June 1998, the Linn County Circuit Court entered a judgment establishing paternity in the filiation case. The court specifically "reserve[d] judgment as to the remaining issues addressed in the Petition," which involved custody and support.

In July, father moved for a change of venue in the Jackson County adoption proceeding to transfer it to Linn County, but that motion was denied. Thereafter, in the Linn County filiation proceeding, the court granted father's motion to consolidate the filiation and adoption proceedings but granted PLAN's motion that venue be changed to the Jackson County Circuit Court.

After the proceedings were consolidated and venue transferred to Jackson County, father sought to preclude adoptive parents from relitigating the question of whether PLAN's placement of child with adoptive parents was fraudulent and whether it violated his constitutional right to due process. Adoptive parents opposed father's motion, arguing that, because they had not appeared in the Linn County proceeding at the time the court had made its determination, they were not bound by it. They also argued that father had demonstrated fraud only by PLAN, and not by adoptive parents, and thus they were not responsible for any violation of his rights. The court denied father's motion on the ground

that attorney Custis was representing only PLAN and not adoptive parents at the time the Linn County court ruled, and thus adoptive parents were not bound by that court's ruling.

In September 1998, the adoption case went to trial. At the close of the evidence, adoptive parents moved for a directed verdict on the ground that, pursuant to ORS 109.096(3), the adoption could proceed without father's consent and that father was unable to avail himself of the fraud exception found in ORS 109.096(8) because he had failed to prove that they, personally, had engaged in fraud. Adoptive parents implicitly acknowledged, and the trial court explicitly agreed, that PLAN had engaged in fraud, but adoptive parents argued that PLAN's conduct could not be imputed to them. Father argued that the adoption should not proceed because of PLAN's fraud. Father acknowledged that adoptive parents had been misled by PLAN but pointed out that they did, in fact, have knowledge of father's objections to the adoption before child was placed with them and that they also were aware that PLAN's placement of child with them violated the 14-day notice that PLAN had extended to father. The court agreed with adoptive parents:

> "I do not disturb the finding made by Judge McCormick [in the Linn County filiation proceeding] as to what PLAN had done, with the exception that as it pertains to the parties here in this court. I believe that the provisions of 109.096 apply and that [father] did not file the notice as required, that the bad acts of PLAN International that have previously been found by Judge McCormick are not attributable to [adoptive parents], because they have not participated in those acts, although they have benefitted from those acts."

The court therefore granted adoptive parents' motion for a directed verdict and entered a judgment of adoption in their favor. The judgment of adoption provided in part that the court found "all of the allegations of the Petition for Adoption to be true,"[1] and further provided:

---

[1] We note that, contrary to the court's conclusion on this point, adoptive parents' petition incorporated by reference false statements by PLAN director Vollman that no proceeding had been instituted to establish paternity as of September 30, 1997. Evidence in the record establishes not only that PLAN and its attorney Custis had notice of the filiation proceeding at the time the adoption petition was filed, but also that adoptive parents had been informed of it as well.

> "The birth father of said child is Carl O. Gruett. The birth father has objected to this adoption. The birth father failed to timely assert his rights in filiation proceedings and failed to give timely notice thereof to the Oregon Bureau of Vital Statistics prior to the surrender of said child to PLAN for purposes of adoption. This adoption should proceed without the consent of said birth father pursuant to ORS 109.092."

The adoption judgment made no explicit disposition of any of the claims raised in the filiation proceeding.

On appeal, father argues that the trial court erred in granting adoptive parents' motion for a directed verdict and in proceeding with the adoption. He makes two related arguments, one procedural and one substantive. He argues that, as a procedural matter, the Jackson County Circuit Court erred in failing to give preclusive effect to the Linn County Circuit Court's order that, due to PLAN's fraud and the consequent violation of father's constitutional rights, ORS 109.096(3) could not be applied against father. He further argues that, even if the Linn County court's ruling was not entitled to preclusive effect in the consolidated proceeding, the Jackson County court erred in applying ORS 109.096(3) against father notwithstanding the fraud that the court itself acknowledged had occurred. Adoptive parents argue in their cross-assignment of error that, even if the Linn County court's ruling was entitled to preclusive effect in the consolidated proceeding, that ruling was incorrect on the merits and cannot compel reversal.

■■ We turn first to the parties' procedural arguments. Father asserts that the Linn County filiation judgment that was entered before consolidation of the cases had a preclusive effect after consolidation and that the Jackson County Circuit Court erred in failing to accord it such effect. The parties advance arguments as to each of the "issue preclusion" requirements set forth in *Nelson v. Emerald People's Utility Dist.*, 318 Or 99, 104, 862 P2d 1293 (1993). Issue preclusion is not applicable under the circumstances presented here, because it would require that the "issue was actually litigated and was essential to a *final decision* on the merits of the prior proceeding." *Id.* (emphasis added). No final decision

was made in the filiation proceeding before it was consolidated with the adoption proceeding. Although the Linn County Circuit Court entered a "Judgment Establishing Paternity" in June 1998, that judgment was not entered pursuant to ORCP 67 B, and it specifically "reserve[d] judgment as to the remaining issues addressed in the Petition," which included custody and child support. Had the "Judgment Establishing Paternity" been entered pursuant to ORCP 67 B, and thus been appealable, it would have been final upon entry. Because that did not occur, there was no "final decision" in the filiation proceeding prior to consolidation. *Accord State ex rel Olson v. Renda*, 171 Or App 713, 717, 17 P3d 514 (2000) ("Because the paternity order did not adjudicate all of the rights and liabilities of the parties under the pleadings, it did not terminate the action. ORCP 67 B. Accordingly, it was subject to revision at any time before the entry of final judgment in the consolidated proceeding."). Thus, the Linn County filiation judgment did not have preclusive effect in regard to adoption issues in the consolidated proceeding.[2]

We turn to father's remaining arguments. Father asserts that the trial court erred in concluding that ORS 109.096(3) prevented him from contesting the adoption. We agree with father that, under the circumstances of this case, that statute cannot and does not bar father from contesting the adoption of child.

ORS 109.092 provides:

"When it is determined that a woman is pregnant with a child, the woman and any man to whom she is not married and with whom she engaged in sexual intercourse at approximately the time of conception have an obligation to recognize that the man may be the other person responsible for the conception. During the months of pregnancy, the man may join the woman in acknowledging paternity and assuming the rights and duties of expectant parenthood. If

---

[2] After the Jackson County judgment in the consolidated proceeding was entered, the filiation judgment became final under the "seriatim judgment" rule. *See generally Zidell v. Jones*, 301 Or 79, 95-98, 720 P2d 350 (1986) (where multiple judgments dispose of all claims as to all parties and the earlier judgments were not separately appealable under ORCP 67 B, the earlier are subject to revision until the final judgment is entered). No appeal or cross-appeal has been taken from the filiation judgment.

the man acknowledges paternity of the expected child and the woman denies that he is the father or refuses to join him in acknowledging paternity, the man may seek relief under ORS 109.125. If the woman wants the man to join her in acknowledging his paternity of the expected child and the man denies that he is the father or refuses to join her in acknowledging paternity, the woman may seek relief under ORS 109.125. *If after the birth of the child the mother decides to surrender the child for adoption and paternity has not been acknowledged as provided in ORS 109.070(1)(e) or the putative father has not asserted his rights in filiation proceedings, the mother has the right without the consent of the father to surrender the child as provided in ORS 418.270 or to consent to the child's adoption.*" (Emphasis added.)

ORS 109.096 provides, in part:

"(3)   The putative father shall be entitled to reasonable notice in a proceeding for the adoption of the child if notice of the initiation of filiation proceedings as required by ORS 109.225 was on file with the Center for Health Statistics of the Health Division of the Department of Human Services prior to the child's being placed in the physical custody of a person or persons for the purpose of adoption by them. *If the notice of the initiation of filiation proceedings was not on file at the time of the placement, the putative father shall be barred from contesting the adoption proceeding.*

"* * * * *

"(8)   A putative father has the primary responsibility to protect his rights, and nothing in this section shall be used to set aside an action of a permanent nature including, but not limited to, adoption or termination of parental rights, *unless the father establishes within one year after the entry of the final decree or order fraud on the part of a petitioner in the proceeding with respect to matters specified in subsections (1) to (5) of this section.*" (Emphasis added.)

Here, father did not satisfy the conditions of ORS 109.092 and ORS 109.096(3). At the time birth mother surrendered child for adoption, father had not acknowledged paternity pursuant to ORS 109.070(1)(e), nor was notice of his initiation of a filiation proceeding on file with the Center for Health Statistics. *See* ORS 109.096(3). Consequently, father cannot contest child's adoption unless he falls within

the fraud exception found in ORS 109.096(8) or unless it would be unconstitutional to apply the statutes to bar father from contesting the adoption. Father asserts both of those arguments.

Adoptive parents respond that the fraud exception of ORS 109.096(8) is inapplicable in this case because the fraud involved was perpetrated by PLAN rather than by adoptive parents, and that adoptive parents, not PLAN, were the petitioners for the adoption described in ORS 109.096(8). They alternatively assert that ORS 109.096(8) is inapplicable because it provides a basis for setting aside a judgment of adoption only upon a showing of fraud *after* the judgment is final.

We address adoptive parents' alternative argument first, because if they are correct that ORS 109.096(8) has no potential application here, that would obviate any need to address father's arguments concerning fraud. It is true that it is not entirely obvious how ORS 109.096(8) applies under these circumstances. It applies to actions "of a permanent nature," including, but not limited to, adoption. It also indicates that any fraud must be established "within" one year of a final adoption judgment. We understand adoptive parents' argument to be that no act of a "permanent nature" occurs until an adoption judgment becomes final and that father's actions to prevent this adoption from occurring all are premature because he may challenge the adoption only in the year *after* the adoption judgment becomes final.

We find adoptive parents' construction of ORS 109.096(8) to be untenable for several reasons. First, it would compel a parent who has prejudgment knowledge of fraud to wait until after the judgment was entered and thus to raise a collateral challenge that could otherwise have been resolved directly. That construction, compelling belated collateral challenges, cannot be reconciled contextually with other related statutes, including ORS 109.381(2). That statute provides:

> "Except for such right of appeal as may be provided by law, decrees of adoption shall be binding and conclusive upon all parties to the proceeding. No party nor anyone

claiming by, through or under a party to an adoption proceeding, may for any reason, either by collateral or direct proceedings, question the validity of a decree of adoption entered by a court of competent jurisdiction of this or any other state."

Interpreting ORS 109.096(8) to permit a biological father who is a party to an adoption proceeding to attempt to establish the fraud exception in the adoption proceeding itself avoids needless conflict between ORS 109.096(8) and the "conclusiveness" provisions of ORS 109.381(2).

■ Moreover, the adoption statutes as a whole, read in context with one another, make it clear that the legislature sought speedy resolution of adoption litigation in order to provide children with stable, permanent homes. *See, e.g.,* ORS 109.307 (setting six-month timeline for action on adoption petition); ORS 109.381(2) (limiting challenges to adoption judgments). Although it is at least theoretically possible to read ORS 109.096(8) in the manner adoptive parents suggest, we do not consider that to be a plausible construction of the statute in light of the clear legislative intent to resolve adoption litigation expeditiously and in light of the infirmities of precluding biological fathers from contesting adoptions under circumstances such as these.[3]

■ The more plausible construction of ORS 109.096(8) is that it can apply to the placement of a child for adoption, which is a "permanent act" insofar as it is an act that may trigger the provisions of ORS 109.096(3) that preclude a father whose notice of filiation proceeding is not yet on file from contesting an adoption. We interpret the language in ORS 109.096(8) concerning establishing fraud "within one

---

[3] We also keep in mind the maxim that when one possible construction of a statute is constitutional and another possible construction of a statute is unconstitutional, "courts will assume that the legislature intended the constitutional meaning." *State v. Kitzman,* 323 Or 589, 602, 920 P2d 134 (1996). We doubt that the legislature would have intended that fraudulent adoptions must be allowed to proceed to the point of a final judgment without regard to the fraudulent conduct involved. The potential constitutional problems of writing biological fathers so thoroughly out of the adoption process are manifest; it is highly unlikely that the legislature intended such a result.

year after the entry of the final decree or order" as simply setting a one-year limit after a final judgment or order to establish fraud, rather than interpreting it to mean that a party may not attempt to establish fraud until an adoption judgment has become final. In other words, the statute sets an outer time limit for a party to establish fraud, but does not require that an adoption be finalized before fraud may be established.

■ We next turn to father's substantive arguments that he demonstrated fraud, bringing him within the fraud exception found in ORS 109.096(8). We also concurrently address adoptive parents' arguments—raised primarily in the context of their cross-assignment of error—that father does not fall within ORS 109.096(8) and thus is barred by ORS 109.096(3) from contesting the adoption. In particular, adoptive parents do not dispute that there was fraud but argue, instead, that *they* did not perpetrate the fraud and that ORS 109.096(8) cannot apply unless they, as petitioners, personally perpetrated the fraud.[4]

Here, PLAN made a representation to father that he had until September 26, 1997, to contact PLAN and that, if PLAN had not heard from father by that date, it would proceed with its plan to place child in an adoptive home. That statement was false, as PLAN proceeded to place child in an adoptive home before September 26, 1997. The misrepresentation was material because, as discussed above, placement of a child in an adoptive home can cut off a putative father's rights to contest an adoption. ORS 109.096(3). Father relied on PLAN's statement that he had 14 days to act, as evidenced by his taking the action recommended by PLAN within the 14 days, *i.e.,* by retaining an attorney, filing a filiation proceeding, and having notice of the filiation proceeding on file with the Vital Statistics Unit within that time. Father had a right to rely on representations by a licensed adoption

---

[1] Fraud is not defined by ORS 109.096(8), but it has a well-established meaning in the law. Establishing fraud requires a material false representation, intent, the other party's ignorance of the falsity, reasonable reliance, and injury. *See generally Rice v. McAlister*, 268 Or 125, 128, 519 P2d 1263 (1974); *Smallwood v. Fisk*, 146 Or App 695, 701, 934 P2d 557 (1997).

agency, which has a legal obligation to provide biological parents with a "statement regarding their legal rights, obligations, and responsibilities." OAR 413-220-0050(1). Father was harmed by the fraud, because it resulted in his failure to initiate a filiation proceeding in a timely manner and thus to have notice of that proceeding on file pursuant to ORS 109.096(3) at the time PLAN placed child with adoptive parents.

Thus, the only question is whether father has established "fraud *on the part of a petitioner*" in the adoption proceeding. ORS 109.096(8) (emphasis added). The trial court acknowledged that the fraud had occurred, but ruled that the fraud was not attributable to adoptive parents, who were the petitioners in this adoption. We disagree. The actual placement of the child with adoptive parents, an act that did not comply with PLAN's notice to father, was done with adoptive parents' knowledge of the situation. That is, although adoptive parents may have been misled by PLAN about the legal effect of placing child in violation of the notice PLAN gave father, they did proceed with the placement with the knowledge that father had been given 14 days to act, and that those 14 days had not run at the time of the placement.

■    While it is true that adoptive parents did not participate personally in every one of PLAN's acts that, taken together, demonstrate fraud, we conclude that, under well established principles of agency, PLAN's fraudulent conduct was carried out on behalf of adoptive parents and is attributable to them. An agency relationship can come about through "an express agreement between the parties, or it may be implied from the circumstances and the conduct of the parties." *Larrison v. Moving Floors, Inc.*, 127 Or App 720, 723, 873 P2d 1092 (1994). In April 1997, PLAN and adoptive parents entered into written agreements indicating that, for a certain fee, PLAN would work to facilitate the referral of a child to adoptive parents for adoption, and that PLAN would "diligently pursue the completion of an adoption for [adoptive parents]." On September 23, 1997, PLAN and adoptive parents entered into a placement agreement indicating that "PLAN will supervise this adoptive placement and will recommend adoption and prepare a court report if PLAN agrees this adoptive placement is in the best interest of the child.

\* \* \*. PLAN International Adoption Services retains legal custody of [child] until the adoption has been legally finalized." In the same agreement, adoptive parents agreed to pay for services to child, to finalize the adoption, to return child to PLAN should they decide not to proceed with the adoption, to "pay all adoption related expenses to PLAN prior to PLAN's consent to the adoption," and to indemnify and hold harmless PLAN as to "any and all charges of any kind at any future time as to any re-opening or attempt to reopening [*sic*] of termination cases or custody of adopted child."

Those agreements gave PLAN actual authority to act on adoptive parents' behalf in placing child with them and facilitating their adoption of child. Taken together, the documents establish that adoptive parents and PLAN reached a mutual agreement that, for a fee, PLAN would act as an agent on adoptive parents' behalf to place a child with them for adoption. Agency is a relationship that "results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Rough & Ready Lumber v. Blue Sky Forest Products*, 105 Or App 227, 231, 804 P2d 498 (1991) (quoting *Restatement (Second) Agency* § 1 (1958)). PLAN consented to act on behalf of the adoptive parents in placing a child with them for adoption and in facilitating the completion of the adoption, and adoptive parents consented to have PLAN act in that capacity on their behalf. PLAN's actions were subject to adoptive parents' control, in that adoptive parents had the choice of whether to proceed with any placement or adoption facilitated by PLAN.

■ Because PLAN acted as an agent for adoptive parents in placing child with them for adoption, PLAN's fraudulent acts toward father are attributable to adoptive parents for purposes of ORS 109.096(8). We understand that this result may seem harsh under the circumstances, given that PLAN apparently misled adoptive parents about the legal effect of placing child with them in contravention of its notice to father indicating that he had 14 days in which to act before any placement would occur. Nevertheless, there is no authority for holding that a principal is not responsible for the acts of its agents simply because the principal failed to appreciate the legal consequences of those acts. In *Barnes v. Eastern &*

*Western Lbr. Co.*, 205 Or 553, 588, 287 P2d 929 (1955), the court stated:

> "[A] principal, who commits to an agent a duty, in the performance of which the agent will be required to make representations, is liable for misrepresentations made by him in the discharge of the duty which he employed in his efforts to serve his principal."

Similarly, in *White v. Gordon*, 130 Or 139, 143, 279 P2d 289 (1929), the court stated:

> "A principal is liable to third persons for frauds, deceits, concealments, torts and omissions of duty to his agent, when acting in the course of his employment, although the principal did not authorize or justify or participate in, or indeed know of such misconduct, or even if he forbade the acts or disapproved of them." (Citations and internal quotation marks omitted.)

*See also Badger v. Paulson Investments Co., Inc.*, 311 Or 14, 23-28, 803 P2d 1178 (1991) (in context of common-law fraud claims, principal was liable for fraudulent securities sales by agents, even though principal was not aware of and did not approve or ratify the agents' misconduct).

In this case, the trial court "found no evidence of fraud by petitioners [adoptive parents] under ORS 109.096(8) and found no basis to attribute to [adoptive parents] actions taken by PLAN International which were previously found to have violated [father's] due process rights."[5] The trial court erred in failing to attribute to adoptive parents the fraudulent actions taken by PLAN on their behalf. Consequently, the trial court erred in granting a directed verdict in favor of adoptive parents and dismissing father's objection to the adoption with prejudice. Adoptive parents have argued no grounds other than ORS 109.096(3) for permitting the adoption to go forward without father's consent. Father, having established paternity, has "the same rights as a father who is or was married to the mother of the child." ORS 109.094. The trial court erred in entering the judgment of adoption.

---

[5] Because we resolve this case based on the fraud provision of ORS 109.096(8), we need not reach the alternative constitutional challenges father raises.

Judgment of adoption vacated; remanded with instructions to dismiss adoption proceeding and for further proceedings on remaining custody and support issues raised in father's filiation proceeding.